[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-13678

_____

D.C. Docket No. 2:16-cr-14071-KAM-1


UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

DARRELL MARK BABCOCK,

Defendant - Appellant.


_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(May 23, 2019)

Before WILLIAM PRYOR and NEWSOM, Circuit Judges, and VRATIL,* District
Judge.

_____

* The Honorable Kathryn H. Vratil, United States District Court Judge for the District of Kansas,
sitting by designation.

NEWSOM, Circuit Judge:

In this case, police officers investigating a domestic disturbance confiscated a suspect's cell phone and held it for two days before eventually obtaining a warrant to search it. The appeal before us presents two Fourth Amendment questions. First, was the seizure justified on the ground that the officers had reasonable suspicion to believe that the phone's owner was engaged in criminal wrongdoing—was it, in effect, a permissible "*Terry* stop" of the phone? We hold that it was not. Second, in the particular circumstances of this case, did the officers have probable cause to believe not only that the phone's owner had committed a crime and that the phone contained evidence of that crime, but also that the suspect would likely destroy that evidence before they could procure a warrant? We hold that they did. Accordingly, and on that ground, we affirm the district court's order denying the motion to suppress. We separately affirm the district court's sentence.

# I

## A

Early one Friday morning, Deputy Andrea Olson of the Stuart, Florida Police Department responded to a domestic-disturbance call reporting a ruckus coming from a camper parked at Darrell Babcock's residence—specifically, a female had been heard yelling, "Stop, stop, stop!" When Deputy Olson knocked on the door of Babcock's camper, Babcock exited, closed the door behind him, and

2

volunteered that no one else was inside.  Almost immediately, though, Deputy Olson heard a female announce that she was coming out.  A teenage girl emerged from the trailer; she was wearing only yoga shorts and a camo jacket, and she had blood on her left thigh.  Seemingly by way of explanation, Babcock handed Deputy Olson his cell phone to show her a video of the girl—we'll call her C.A.—sitting on a bed, holding a knife to her own throat and saying that she wanted to die.  In the video Babcock could be heard berating the girl, telling her, "you're dumb as f***" and complaining, "this is what I deal with right here . . . you gotta do drama and fighting me all over the place."  After viewing the clip, Deputy Olson returned Babcock's phone.  When backup arrived on the scene, Deputy Olson asked for the phone again so that she could show the video to her colleague, Officer Michael McMahan.

The officers then interviewed Babcock and C.A. separately.  Babcock denied knowing C.A.'s age and also disputed that the two were in a relationship, although he admitted that he had known C.A. for three years and that she used to be his neighbor.  He also said that C.A. had shown up at his camper unannounced, sometime during the middle of the night.  C.A., by contrast—whose license showed that she was only 16 years old—stated that she and Babcock had gone together the night before to a Halloween party, where she had consumed alcohol, cocaine, and other substances.  After answering a few questions, C.A. began either

panicking or experiencing the effects of an overdose, so the officers called an ambulance. Deputy Olson rode with C.A. to the hospital.

Meanwhile, another officer, Detective Brian Broughton, remained behind to continue questioning Babcock. Detective Broughton sought and received permission to search Babcock's camper, where he discovered blood on the bedsheets and prescription pills scattered about. When Detective Broughton asked to further inspect Babcock's phone, Babcock refused and asked to have it back. Babcock offered to e-mail the video clip of C.A. with the knife, but Detective Broughton decided to keep the phone instead. He told Officer McMahan to enter it into evidence and then took it with him to the hospital to talk to C.A.

At the hospital, C.A. again insisted that she and Babcock were just friends, that they had gone to a Halloween party, and that the two had then argued. She firmly denied any further relationship. But when Detective Broughton informed C.A. that he had Babcock's phone, she abruptly reversed course and admitted that the two had been in a relationship and, further, that the officers would find sexually explicit images of her on the phone. Two days later, Detective Broughton applied for and obtained a warrant to search the phone, where he found nude images of C.A. and explicit video recordings of Babcock and C.A. together.

**B**

Babcock was charged with two counts of producing a visual depiction of sexually explicit conduct with a minor in violation of 18 U.S.C. § 2251(a), (e).  He filed a motion to suppress, arguing that officers had seized his phone without a warrant or probable cause.  The government filed a response, arguing primarily that the cell-phone seizure was reasonable because "under the totality of the circumstances" the officers had "reasonable suspicion to investigate further," and adding that, at any rate, the officers had probable cause to believe that the phone contained evidence of a crime.  The government further contended that "detention of the cell phone was necessary to preserve the evidence observed by the deputies."  Finally, the government asserted that, even in the absence of a warrant, either Babcock's consent or the inevitability that the images would have been discovered rendered the seizure constitutional.

A magistrate judge recommended that Babcock's motion be denied.  He concluded—referencing two distinct Fourth Amendment standards—that "the collective knowledge and information received by the officers at the scene constituted sufficient probable cause and reasonable suspicion that there may have been a crime committed which may have been preserved on the cell phone."  The district court agreed, noting—also somewhat vaguely—that the surrounding circumstances were "sufficient for law enforcement to suspect inappropriate

5

conduct between [Babcock] and C.A."  Later, at sentencing, the district judge

further remarked that although he "didn't say [it] in the order," he was "putting [it]

on the record for appellate purposes" that in the video C.A. "appear[ed] to be either

with no pants on or underwear" and that, based on "what she says and how she

says it about what she wants to do to herself," it was "obvious . . . that there was an

inappropriate relationship going on which would have given [the officers]

reasonable probable cause to believe that there was inappropriate sexual activity

between" Babcock and C.A.  Babcock took a plea, reserving his right to appeal the

denial of his motion to suppress.

At sentencing, Babcock asked for the mandatory minimum of 180 months,

arguing that his conduct, while inappropriate, was outside the core child-

pornography-distribution behavior that Congress sought to deter under § 2251(a)

and (e).  The government in turn asked for a sentence within the 360-to-720-month

recommended Guidelines range, stressing the harm to C.A. and her family.  The

court imposed a below-Guidelines sentence of 324 months.  Babcock appealed

both the denial of his motion to suppress and his sentence.

## II

We'll tackle the Fourth Amendment issues first.  A person suffers a

"seizure" of his property within the meaning of the Fourth Amendment when there

is a "meaningful interference" with his possessory interest in it.  *United States v.*

*Virden*, 488 F.3d 1317, 1321 (11th Cir. 2007).[1]  While the seizure of private property generally requires a warrant, the Supreme Court has interpreted the Fourth Amendment to allow a warrantless seizure when police can show both (1) probable cause to believe that property contains contraband or evidence of a crime and (2) an applicable warrant exception, such as exigent circumstances.  *See, e.g.*, *Kentucky v. King*, 563 U.S. 452, 459–60 (2011) (citations omitted).  Accordingly, absent either a warrant or probable cause plus an exception, police may not seize private property.  There is, however, an asterisk.  Under a line of luggage-related cases from the 1980s, police may "briefly detain" property—*Terry*-stop style—on the strength of reasonable suspicion alone.  *See United States v. Place*, 462 U.S. 696, 697–98 (1983); *United States v. Puglisi*, 723 F.2d 779, 788–89 (11th Cir. 1984).

Here, the government principally argues that these cases permitted the officers to detain Babcock's phone based on their reasonable suspicion that he had committed a crime.  Alternatively, the government contends that the officers had probable cause to believe that the phone contained evidence of a crime and that exigent circumstances—namely, the need to prevent the destruction of that evidence—allowed them to seize the phone.  We consider each argument in turn.

---

[1] When reviewing the denial of a motion to suppress, we review factual findings for clear error and legal determinations *de novo*.  *United States v. Gibson*, 708 F.3d 1256, 1274 (11th Cir. 2013).  We also review the evidence in the light most favorable to the government, as the prevailing party.  *See United States v. Capers*, 708 F.3d 1286, 1295–96 (11th Cir. 2013).

7

## A

## 1

Reasonable suspicion is "a particularized and objective basis" for suspecting a person of criminal activity. *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (quotation marks omitted). It requires "specific, articulable, and objective facts reasonably to suspect" that a crime is being or will soon be committed, *Puglisi*, 723 F.2d at 789, but "is a less demanding standard than probable cause," *Illinois v. Wardlow,* 528 U.S. 119, 123 (2000). In *Terry v. Ohio*, the Supreme Court famously held that, even absent probable cause, police officers may briefly detain an individual based on reasonable suspicion that he is (or is about to be) engaged in criminal activity. *See* 392 U.S. 1, 30–31 (1968).

The Supreme Court first extended *Terry*'s rationale from people to property in *United States v. Place*, 462 U.S. 696 (1983). There, the Court held that while a brief investigatory detention of property *could* be justified on the basis of reasonable suspicion alone, an officer's 90-minute seizure of an airline traveler's suitcase exceeded constitutional boundaries. *Id*. at 702. In so holding, the Court recognized that "[t]he intrusion on possessory interests occasioned by a seizure of one's personal effects can vary both in its nature and extent." *Id*. at 705. While some "brief detentions of personal effects"—such as, the Court hypothesized, "on-the-spot" dog sniffs—may be "so minimally intrusive" as to "justify a seizure

8

based only on specific articulable facts that the property contains contraband," the luggage seizure didn't fit the bill. *Id*. at 705–06.  By way of explanation, the Court emphasized several factors: the duration of the detention, the degree of the intrusion on the owner's possessory interests in his property, and the officer's lack of diligence in timely pursuing their investigation. *Id*. at 709–10.  The Court also highlighted that a confiscation of luggage, in particular, interferes not only with possessory interests but also with liberty interests because, while a suspect whose luggage is stopped is "technically still free to continue" on his way, the detention might "effectively restrain" him by disrupting his travel plans. *Id*. at 708–09.

Shortly after the Supreme Court decided *Place*, this Court had occasion to apply it on similar facts.  In *United States v. Puglisi*, an officer made what began as a brief stop by ordering a suspicious traveler's bags removed from a luggage cart; he then stowed the luggage in his office until a drug-sniffing dog became available. 723 F.2d 779, 790 (11th Cir. 1984).  Meanwhile, the traveler boarded his flight without his bags.  Although we deemed the initial seizure permissible under *Terry*, we found that the length and intrusiveness—140 minutes—caused the "brief stop" to "ripen" into a full-blown seizure that could be justified only by probable cause. *Id*. at 784.  We explained that "*Place* requires the same test as *Terry*: a court must weigh the intrusiveness of a limited seizure of the individual against society's interest in detection and prevention of crime." *Id*. at 785.  We cautioned, however,

9

that because the Fourth Amendment "protects people, not things," the focus was the effective "seizure of persons, through their luggage." *Id.* at 787–88.

Although *Place* and *Puglisi* concerned luggage, both this Court and others have since indicated that any detention of property based on reasonable suspicion must be fairly analogous to a *Terry* stop, regardless of the item at issue. Accordingly, we have said, "the factors used to determine whether a *Terry* stop has matured into an arrest are also useful in evaluating whether a seizure of property required probable cause" rather than mere reasonable suspicion. *Virden*, 488 F.3d at 1321. Echoing *Place*, we have said that these factors include, but are not limited to, (1) the detention's duration, (2) its intrusiveness, (3) the diligence with which officers pursued their investigation, and (4) the law-enforcement purposes served by the detention. *See id.*; *accord United States v. Gonzalez*, 781 F.3d 422, 428–29 (8th Cir. 2015); *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 544–45 (6th Cir. 2002); *United States v. $557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 86 (2d Cir. 2002). We'll explain each in a bit more detail here before applying them to the facts of this case

First, duration. Although the Supreme Court has "decline[d] to adopt any outside time limit for a permissible *Terry* stop," the Court in *Place* observed that it had "never approved a seizure of the person for the prolonged 90-minute period involved" in that case and that, on the facts presented there, it wouldn't approve a

10

90-minute detention of property, either.  462 U.S. at 709–10.  In *Virden*, this Court similarly determined that an officer's transfer of a defendant and his car to another location for a dog sniff, "[w]hile not unduly lengthy" at about 30 minutes, was nonetheless "unreasonable absent probable cause."  488 F.3d at 1321.[2]

At the other end of the spectrum, the Fourth Circuit has approved a seconds-long cell-phone stop on the basis of reasonable suspicion alone.  In *United States v. Lawing*, that court held that an officer's brief detention of a suspect's phone during a traffic stop—for just long enough to see if it would ring when the officer dialed a known drug-distributor's number—was sufficiently minimal to qualify for *Terry*/*Place* treatment.  703 F.3d 229, 238 (4th Cir. 2012).  Similarly, the Second Circuit held that reasonable suspicion justified a brief investigatory detention that occurred when a detective took between two and 20 minutes to respond to a request for a luggage investigation while a traveler waited at an airport security checkpoint with his luggage.  *See $557,933.89, More or Less*, 287 F.3d at 71, 86–87 & n.16.

Second, intrusiveness.  The "intrusiveness" factor concerns the degree to which a property detention interferes with a person's possessory interest in his belongings.  In *Place*, for instance, the Court emphasized that although "the

---

[2] Even though the detention there more directly implicated the owner's liberty interests than in *Place* because the owner remained in his car while it was transported to another location, we analyzed the stop primarily as one of property rather than of an individual.  *See Virden*, 488 F.3d at 1321.

particular course of investigation that the agents *intended* to pursue"—just a brief "exposure of respondent's luggage, which was located in a public place, to a trained canine"—would have been permissible based on mere reasonable suspicion, the 90-minute seizure that they *actually* effected was not. 462 U.S. at 707, 709–10 (emphasis added). The Court explained that the planned sniff would have revealed "only the presence or absence of narcotics, a contraband item," and wouldn't have exposed the traveler's personal "noncontraband items that otherwise would remain hidden from public view, as [would], for example, an officer's rummaging through the contents of the luggage." *Id.* at 707.

This Court has likewise recognized that individuals have strong interests in containers that hold personal effects or private information, such as luggage and computers. In *Puglisi*, we emphasized that "privacy and possessory interests in luggage are often high" because a traveler may have "his most important and private possessions in his suitcase" and likely wants "to shield them from the prying eyes of strangers, especially the government." 723 F.2d at 786. And in *United States v. Laist*, we acknowledged that "computers are a unique possession, one in which individuals may have a particularly powerful possessory interest," because they store "personal letters, e-mails, financial information, passwords, family photos, and countless other items of a personal nature." 702 F.3d 608, 614 (11th Cir. 2012); *see also United States v. Mitchell*, 565 F.3d 1347, 1352 (11th Cir.

12

2009) (calling a computer hard drive "the digital equivalent of its owner's home, capable of holding a universe of private information") (internal quotation marks omitted).

Third, diligence.  When police diligently pursue their investigation, a reviewing court can have greater confidence that the governmental interest is legitimate and that the intrusion occasioned by the challenged detention was no greater than reasonably necessary.  *See United States v. Burgard*, 675 F.3d 1029, 1033 (7th Cir. 2012).  "Diligence" in this context includes not only seeking a warrant application promptly, but also communicating with the suspect concerning the specifics of the detention.  In *Place*, for instance, the Court faulted officers for failing to inform the suspect where and for how long they were taking his bags, and when and how he could get them back.  *See* 462 U.S. at 710.  So too, in *Farm Labor*, the Sixth Circuit observed—in the course of holding that the seizure of two suspects' green cards couldn't be justified based on reasonable suspicion alone— that an officer had failed to act diligently when he "wait[ed] for four days to return [their] green cards" and that "[t]he unreasonable nature of the seizure was exacerbated by the undisputed fact that [the officer] did not make clear . . . how

13

long the documents would be held or when or how he would return them." 308

F.3d at 546–47 (internal quotation marks omitted).[3]

Finally, governmental interest. The final factor looks at the other side of the

ledger. As the Court explained in *Place*, "[t]he exception to the probable-cause

requirement for limited seizures of the person recognized in *Terry* and its progeny

rests on a balancing of the competing interests to determine the reasonableness of

the type of seizure." 462 U.S. at 703. Thus, "[w]e must balance the nature and

quality of the intrusion on the individual's Fourth Amendment interests against the

importance of the governmental interests alleged to justify the intrusion." *Id.*

In *Place*, that meant taking account of the public's compelling interest in

"detecting those who would traffic in deadly drugs for personal profit." *Id.*

(internal quotation marks omitted).

## 2

How, then, do these considerations stack up in this case? In short, not well

for the government. To begin at the end, we don't doubt for a moment the

government's "compelling" interest in preventing the creation and distribution of

child pornography. *E.g.*, *New York v. Ferber*, 458 U.S. 747, 761 (1982). Standing

alone, though, that interest can't counterbalance the duration, intrusion, and

---

[3] The diligence component of the analysis necessarily intersects with the duration component because, "[i]n the ordinary case, the sooner the warrant issues, the sooner the property owner's possessory rights can be restored if the search reveals nothing incriminating"—and, of course, the sooner an officer seeks a warrant, the sooner a warrant can issue. *See Mitchell*, 565 F.3d at 1352 (citation omitted).

diligence factors, all of which—for reasons we will explain—weigh heavily here in favor of a determination that the officers' two-day seizure of Babcock's phone was not just a brief "investigatory stop" but rather a full-blown seizure that required a showing of full-blown probable cause. *See Place*, 462 U.S. at 699–700.

Looking first to duration, the government cites *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975), for the proposition that law enforcement may "conduct a limited warrantless seizure of a person or item 'on facts that do not constitute probable cause.'" Br. of Appellee at 15. *Brignoni-Ponce*, however, considered only whether a *momentary* stop for "a brief question or two" was permissible on less than probable cause. 422 U.S. at 880; *see also Place*, 462 U.S. at 709 (describing *Terry* and *Brignoni Ponce* as involving "momentary" stops). But that's a far cry from the two-day pre-warrant seizure at issue here. The government also points to what it calls the "similar" case of *Laist*, in which we held that a 25-day delay between a seizure and a warrant was permissible. 702 F.3d at 614–15. But *Laist* isn't similar at all; the seizure in that case was based on probable cause, not mere reasonable suspicion. *Id.*; *see also Burgard*, 675 F.3d at 1033 (explaining, in justifying a six-day delay, that a seizure supported by probable cause permits a much greater intrusion than a seizure supported by mere reasonable suspicion).

15

What of the more analogous decisions in *Place* and *Puglisi*?  The government seeks to distinguish them on the ground that both cases analyzed the seizure of luggage "as essentially a detention of the person."  Br. of Appellant at 16 n.4.  The government asserts that *Puglisi*, in particular, is inapt because the Court there held that "[f]or time even to be relevant, the seizure of luggage must have actually or constructively seized the person."  723 F.2d at 788.

Two responses.  For starters, we don't think that this one line, taken alone, represents the holding of *Puglisi*.  *See Dantzler v. I.R.S.*, 183 F.3d 1247, 1251 (11th Cir. 1999) ("A judicial opinion is not a statute, and not every sentence in a judicial opinion is law.").  Constructive seizure of the person was not the *only* element relevant to whether the luggage detention in *Puglisi* was permissible based on reasonable suspicion alone.  Instead, we analyzed the 140-minute seizure against *Place*'s considerations of duration, intrusiveness, and diligence before deeming the detention unlawful.  *Puglisi*, 723 F.2d at 788, 790–91.

Furthermore—and more importantly—it's not clear why, under the rationale of *Place* and *Puglisi*, an officer's confiscation of a cell phone is any *less* a constructive seizure of its owner than his detention of luggage (which, per *Place*, would make even 90 minutes too long).  In *Place* the Court reasoned that while a suspect whose luggage is detained is "technically still free to continue his travels," the seizure might nonetheless "effectively restrain" him by disrupting his travel

16

plans. 462 U.S. at 708. Given the ubiquity of cell phones—and our increasing reliance on them—it's no stretch to hazard that a modern-day traveler would likely rather arrive in a strange place without her luggage than without her phone. Without the former, she may be left with only the "clothes on [her] back," *Puglisi*, 723 F.2d at 786, but without the latter she may be left without directions, hotel reservations, and payment and ride-share apps, not to mention voice, text, and email communications—in short, isolated and incapacitated. Whatever heft the constructive-seizure argument has with respect to luggage applies equally (if not *a fortiori*) to cell phones. In any event, no matter what one thinks about the relative import of luggage and phones, it's clear that the duration of the seizure in this case puts it in a different bucket than the on-the-spot inquiry hypothesized in *Place*, *see* 462 U.S. at 705–706, or carried out in *Lawing*, *see* 703 F.3d at 238.[4]

Next, the intrusion into Babcock's possessory interest in his private property was serious. For many of the reasons just explained, a person's possessory interest in his cell phone is at least as high as—if not higher than—his interest in his

---

[4] The government suggested for the first time at oral argument that, rather than lasting two days, the reasonable-suspicion-based seizure lasted only until Detective Broughton used the phone to prompt C.A.'s confession, at which time the reasonable suspicion became probable cause and, presumably, washed away any budding issues with the seizure. We decline to wade into this argument when the entire record below is predicated on the seizure lasting two days. Because the government made no argument—and the district court made no finding—concerning the length of time between the seizure and the confession, any determination of the same on our part would be mere speculation. *See Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018) (declining to consider the government's argument raised for the first time on appeal when argument was predicated on factual issue "not addressed" below and "unclear" from the record).

17

luggage.  A smart phone, as the Supreme Court recently emphasized, is unique in both the breadth and depth of personal information it stores, including "photographs, picture messages, text messages, Internet browsing history, a calendar, a thousand-entry phone book"—information that, all told, "reveal[s] much more in combination than any isolated record." *Riley v. California*, 573 U.S. 373, 394 (2014).  In other words, while a piece of luggage may hold certain physical items that an individual needs for a trip, a cell phone holds "[t]he sum of an individual's private life"—hence our attentiveness to (which is to say obsession with) our cell phones.  *Id.*  Put simply, the government's confiscation of Babcock's phone for a period of two days—and with it his personal messages, contacts, calendar, and more—worked a serious interference with his possessory interests, and undermines the government's current contention that the seizure was but a "limited intrusion" allowable based on mere reasonable suspicion.

Finally, diligence.  Detective Broughton's actions here—holding onto Babcock's phone over the weekend rather than more promptly attempting to secure a warrant, either telephonically or in person—further confirm that the seizure in this case looks nothing like a *Terry* stop.  The government has offered no explanation as to why Detective Broughton waited more than two days to take any action regarding the phone, nor does the record evidence indicate that he explained to Babcock when or whether he could expect to get his phone back.  And while a

two-day delay certainly wouldn't cross the line in the probable-cause context, *see, e.g.*, *Laist*, 702 F.3d at 614–15 (approving a 25-day delay in obtaining a warrant following a probable-cause seizure), we know from precedent that it's well outside the realm of a permissible *Terry* stop, and thus weighs heavily against a finding of diligence here, *see Place*, 462 U.S. at 710; *Virden*, 488 F.3d at 1321; *Farm Labor*, 308 F.3d at 546–47.

\* \* \*

Accordingly, we reject the government's contention that the officers' two-day detention of Babcock's cell phone was a mere investigatory "stop" allowable based on reasonable suspicion alone.  Rather, we hold that it "ripened" into a full-blown seizure that required probable cause.  *See Puglisi*, 723 F.2d at 784.

**B**

The government contends, in the alternative, that it can meet the probable-cause standard and, further, that it can show that exigent circumstances justified a warrantless seizure.  We will consider the two components of the government's argument in turn, looking first to whether the officers at Babcock's residence had probable cause to believe that his phone contained evidence of a crime, and then to whether exigent circumstances excused them from the need to obtain a warrant pre-seizure.

19

**1**

Probable cause to seize property is what it sounds like—a belief that evidence will *probably* be found in a particular location. *See United States v. Noriega*, 676 F.3d 1252, 1261 (11th Cir. 2012). As the Supreme Court recently reiterated, probable cause "is not a high bar." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). Although probable cause requires more than reasonable suspicion that criminal behavior is afoot, it doesn't entail the same "standard of conclusiveness and probability as the facts necessary to support a conviction." *United States v. Dunn*, 345 F.3d 1285, 1290 (11th Cir. 2003) (internal quotations omitted). Rather, it requires only "a substantial chance" that evidence of criminal activity exists. *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983). We recently explained that this "substantial chance" exists "where the facts within the collective knowledge of law enforcement officials" suffice "to cause a person of reasonable caution to believe that a criminal offense has been or is being committed"—and here, that evidence of that offense will be found in a particular place. *Gates v. Khokar*, 884 F.3d 1290, 1298 (11th Cir. 2018) (internal quotation marks omitted).

Babcock contends that while the officers in this case might have suspected that something was up, their collective knowledge at the time of the seizure didn't rise to the level of probable cause that a crime had been committed. To evaluate

that contention, let's recap:  At the time Detective Broughton retained Babcock's

phone, the officers knew—

- that a domestic-disturbance call had reported a female at Babcock's
  residence yelling "Stop, stop, stop!";

- that after Babcock had denied that anyone else was in his camper, a teenage
  girl emerged with cuts on her legs;

- that Babcock had accompanied the girl to a Halloween party the night
  before, where she had consumed alcohol and drugs, and that she was in his
  camper the next morning;

- that the girl had been in or on Babcock's bed and left traces of blood there;

- that the girl had been distraught, holding a knife to her own throat and
  saying, "I just want to die"; and

- that shortly after they arrived at Babcock's residence, the girl appeared to be
  panicking or suffering an overdose.

Finally—and perhaps most tellingly—the officers knew that, while the girl sat on

Babcock's bed with the knife to her neck, Babcock called her "dumb as f***" and

then complained—in the present tense—that "this is what I deal with right here . . .

you gotta do drama and fighting me all over the place."

Collectively, these circumstances gave the officers probable cause to believe

that Babcock had committed a crime against C.A.  This common-sense conclusion

doesn't depend on any particular fact taken in isolation; rather, as is "often" the

case, "the whole is . . . greater than the sum of its parts."  *Wesby*, 138 S. Ct. at 588;

*see United States v. Arvizu*, 534 U.S. 266, 274 (2002) (rejecting a "divide-and-

21

conquer" approach and instructing courts to evaluate probable cause in light of the totality of the circumstances).  Here, Babcock's lies contributed to probable cause, *see Wesby*, 138 S. Ct. at 587 (citing *Devenpeck v. Alford*, 543 U.S. 146, 149, 155–56 (2004)), as did his own present-tense statements clearly indicating an ongoing relationship.  When the officers considered Babcock's own utterances in light of the litany of other suspicious facts the learned, they certainly could have suspected a "substantial chance of criminal activity."  *Gates*, 462 U.S. at 243 n.13.

From there, it required no leap for the officers to deduce that evidence of a crime would likely be found on Babcock's phone.  The officers already knew that the phone contained one eyebrow-raising video suggesting an ongoing relationship between a grown man and a teenage girl.  It was eminently reasonable for them to believe that additional evidence of that relationship—messages, texts, pictures, videos, etc.—would be found in the same place.

True, as Babcock points out, the government has been a little wishy-washy about the *exact* crime that the officers suspected at the time of the seizure.  The government doesn't contend that the officers had probable cause to believe that the phone contained evidence of child pornography; rather, it concedes that until Detective Broughton confronted C.A. with the phone at the hospital post-seizure, he had "no reason to believe that there were videos of sexual activity between [the] two."  Importantly, though, our precedent doesn't require officers to predict the

22

eventually-charged offense in order to demonstrate probable cause, only that the collective facts would cause a "person of reasonable caution" to believe that "*a criminal offense has been or is being committed.*" *See Khokar*, 884 F.3d at 1298 (emphasis added) (internal quotation marks omitted).

Here, the government's arguments at the suppression hearing focused mainly on preserving both the video of C.A. on the bed and any evidence that might have shed light on the events leading up to it. And indeed, that is exactly what the officers ended up finding: evidence of an illegal, coercive relationship, confirming the suspicions sparked by the video's portrayal of Babcock's disdainful, bullying tone and C.A.'s distraught appearance. The fact that the phone also (and unexpectedly) contained pornographic images and videos doesn't invalidate probable cause for any number of Florida state crimes the officers reasonably could have believed occurred based on the scene greeting them at Babcock's residence. *See, e.g.*, Fla. Stat. § 794.05(1) ("Unlawful sexual activity with certain minors"); *id.* § 794.011(4)(a) ("Sexual battery"). Accordingly, we hold that on these facts the officers had probable cause to believe that Babcock was guilty of a crime, and that evidence of the crime would be found on his phone.

## 2

Of course, probable cause isn't alone enough to seize an individual's personal property—officers typically need a warrant. "[A] warrantless search

23

and seizure can be justified," however, "when probable cause has been established to believe that evidence will be removed or destroyed before a warrant can be obtained." *United States v. Young*, 909 F.2d 442, 446 (11th Cir. 1990). This exception—one branch of the "exigent-circumstances" doctrine—entails, like probable cause itself, an objective inquiry. *See United States v. Bradley*, 644 F.3d 1213, 1262 (11th Cir. 2011).

Historically, we have found the exigent-circumstances exception "particularly compelling" in drug cases "because contraband and records can be easily and quickly destroyed while a search is progressing." *Young*, 909 F.2d at 446. The same is true of electronic files. In *Bradley*, for instance, we found that the exigent-circumstances exception permitted officers to shut down a company's servers—a seizure of the company's property—when multiple employees "had the ability and incentive to, after learning of the raid, destroy damning information contained on the computer servers." 644 F.3d at 1262–63.

To be clear, it's not that a cell phone *itself* creates an exigent circumstance. "Taken to its logical conclusion," that "would permit police officers to seize now-ubiquitous cell phones from any person, in any place, at any time, so long as the phone contains photographs or videos that could serve as evidence of a crime—simply because the 'nature' of the device used to capture that evidence *might* result in it being lost." *Crocker v. Beatty*, 886 F.3d 1132, 1137 (11th Cir. 2018)

24

(emphasis in original).  In *Crocker*, we held that the exigent-circumstances exception didn't apply where an officer had seized a bystander's phone to prevent deletion of photographs that he observed the onlooker snapping following a huge highway crash.  *Id.*  Absent any reason for the officer to think that the bystander wouldn't preserve the pictures or would refuse to turn them over if asked, we found the government's exigent-circumstances argument unconvincing.  *Id.*

This case is different.  Given the facts here, a reasonable, experienced agent certainly could have believed that Babcock—the suspect, not a mere bystander— would delete any incriminating evidence on his phone before a warrant could be obtained.  For starters, Babcock had tried to deceive the responding officers from the get-go, denying that anyone else was in his camper, reporting that C.A. had randomly shown up at his house in the middle of the night, and claiming that he didn't know her age—all lies.  Moreover Babcock surely knew that he was under suspicion once Detective Broughton asked to search the camper and to further inspect his phone.  Finally, of course, and on top of all that, the electronic files on Babcock's phone could have been "quickly destroyed while [the] search [wa]s progressing." *Young*, 909 F.2d at 446.  All told, as in *Bradley*, it was reasonable for the officers here to conclude that Babcock had the "ability and incentive to, after learning" of the investigation into his relationship with C.A., "destroy

25

damning information contained on" his phone.  644 F.3d at 1262–63.  That's all the exigent-circumstances doctrine requires.[5]

Babcock contends that his offer to e-mail the video to the officers removed any urgency, thereby undermining any exigent-circumstances argument.  He cites our decision in *United States v. Hernandez-Cano*, 808 F.2d 779 (11th Cir. 1987), for the proposition that officers can't claim exigent circumstances when the supposed risk can be alleviated by alternative means.  But *Hernandez-Cano* was different—and in fact boomerangs back around on Babcock here.  There, we considered a warrantless *search* of a suspect's luggage and determined that, because officers had probable cause to arrest him at the time of the search, "any exigencies inherent in the situation could have been removed" by simply doing so.

---

[5] Babcock asserts that the government forfeited its exigency argument by failing to use the phrase "exigent circumstances"—and failing to fully develop its position regarding the same—in its response to the motion to suppress.  We disagree.  While it's true that alternative theories of admissibility—including exigent circumstances—can be forfeited even when the government is the appellee or respondent, *see Steagald v. United States*, 451 U.S. 204, 208 (1981); *Giordenello v. United States*, 357 U.S. 480, 487–88 (1958), we conclude that the government did enough here to preserve its exigent-circumstances argument.  To be sure, in responding to Babcock's motion to suppress, the government didn't use the phrase "exigent circumstances" or cite case law specifically in support of the exception.  It did argue, though, that "[t]he deputies had probable cause to believe that the phone *had evidentiary value*" and that "detention of the cellular phone was *necessary to preserve the evidence* observed by the deputies." Gov't Resp. Mot. Suppress at 5 (emphasis added).  That—whether accompanied by magic words or not—is the very definition of the exigent-circumstances exception.  *See, e.g.*, *Young*, 909 F.2d at 446 ("[W]hen probable cause has been established to believe that evidence will be removed or destroyed before a warrant can be obtained, a warrantless search and seizure can be justified.").  That the government presented a more robust version of its argument on appeal doesn't render its initial argument null.  *See, e.g.*, *Sec'y, U.S. Dep't of Labor v. Preston*, 873 F.3d 877, 883 n.5 (11th Cir. 2017) (explaining that "[o]ffering a new argument or case citation in support of a position advanced in the district court is permissible—and often advisable" lest "the quality and depth of argument [fail] to improve on appeal—an unfortunate result"), *cert. denied sub nom. Preston v. Acosta*, 138 S. Ct. 2680 (2018).

*Id.* at 782.  We explained that "[e]ven if exigent circumstances existed that justified the *seizure* of the suitcase to prevent the loss or destruction of its contents, the government still had to obtain a warrant to *search* the suitcase."  *Id.* (emphasis added).  Here, the officers didn't conduct a warrantless search.  Instead, faced with the potential destruction of evidence, they did exactly what *Hernandez-Cano* suggests they should have done—they seized the phone "to prevent the loss or destruction of its contents," and then obtained a warrant before searching through it.  *See id.*

Thus, because a reasonable officer could have believed that Babcock would delete any incriminating evidence on his phone before a warrant could be obtained—and because none of Babcock's arguments convinces us otherwise—we find that the exigent-circumstances exception applies in this case.[6]

*    *    *

---

[6] The government also argues in the alternative that Babcock consented to the seizure by voluntarily providing his phone to the officers to display the video of C.A. threatening self-harm. It is well-settled, however, that "the scope of a search based on consent may not exceed the scope of the given consent." *United States v. Watkins*, 760 F.3d 1271, 1279 (11th Cir. 2014) (citing *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)).  The standard for measuring the scope of consent is "objective reasonableness"—what "would the typical reasonable person have understood by the exchange between the officer and the [individual giving the consent]?" *Id. (*internal quotation marks omitted).  Here, Babcock clearly consented only to the officers' viewing the video he showed them.  After the initial viewing, Deputy Olson asked for the phone again, for the express purpose of showing Officer McMahan the video.  Babcock consented to the officers viewing the clip again, but then asked for his phone back and refused consent when Detective Broughton asked to poke around further.  Contrary to the government's contention, the initial limited-in-scope consent doesn't justify an unlimited-in-scope full seizure over Babcock's objection.

To sum up, we reject the government's contention that a two-day warrantless seizure of a suspect's cell phone is permissible based on reasonable suspicion alone. We conclude, however, that the warrantless seizure of Babcock's phone was lawful because the officers on the scene had probable cause to believe both that evidence of a crime would be found on it and that the evidence would be destroyed before they could obtain a warrant.

## III

Babcock separately challenges his sentence, arguing that it is both (1) procedurally unreasonable because the district court erroneously imposed two enhancements for the same harm and (2) substantively unreasonable because it is too harsh in light of the facts.[7]  Neither argument is persuasive.

Babcock raises his procedural-reasonableness argument for the first time on appeal, so we can correct any missteps only if he shows a "plain error" that affects his substantial rights and that seriously undermines the fairness, integrity, or public reputation of judicial proceedings. *See United States v. Shelton*, 400 F.3d 1325, 1328–29 (11th Cir. 2005). Babcock essentially argues that the district court's application of both § 2G2.1(b)(2) and § 4B1.5(b) of the Sentencing Guidelines constitutes impermissible double-counting.

---

[7] Babcock also argues that his sentence is procedurally unreasonable because the government did not group two counts of conviction which were based on the same harm. As the government points out, though, the Guidelines specifically exclude convictions under § 2G2.1 from the grouping rules. *See* U.S.S.G. § 3D1.2(d).

28

Double-counting occurs when one part of the Sentencing Guidelines is applied to increase a defendant's punishment on account of a harm that has already been fully accounted for by application of another part of the Guidelines. *See United States v. Dudley*, 463 F.3d 1221, 1226–27 (11th Cir. 2006). Absent evidence to the contrary, however, the presumption is that "the Sentencing Commission intended to apply separate sections cumulatively," *United States v. Kapordelis*, 569 F.3d 1291, 1315 (11th Cir. 2009) (citation omitted), such that what might appear to be impermissible double-counting is instead what we will call permissible "cumulative-counting."

We conclude that applying both enhancements in this case constitutes cumulative- (rather than double-) counting. Chapter Two of the Guidelines, focusing on the sexual exploitation of minors through pictures, provides that an offender's base sentencing level should be enhanced by two when "the commission of a sexual act or sexual contact" occurs during a visual depiction. U.S.S.G. § 2G2.1(b)(2)(A). Chapter Four then makes clear that when a "pattern of . . . prohibited sexual contact" occurs, a court should add five to "the offense level determined under Chapter[] Two." U.S.S.G. § 4B1.5(b). The Guidelines say nothing about adding this enhancement to only a *portion* of the base level determined under Chapter Two, or otherwise adjusting the calculation in any way—instead, they simply presuppose that a certain offense level was determined

under Chapter Two, and then instruct the sentencing court to add five levels, period.  Nothing in the Guidelines, then, indicates that these sections may not be applied cumulatively.  *See Kapordelis*, 569 F.3d at 1315.  Moreover, and in any event, it isn't clear that the harm in § 4B1.5(b)'s "*pattern of activity* involving prohibited sexual contact"  is "fully accounted for" in § 2G2.1(b)(2)'s "sexual act or sexual contact" occurring in a *visual depiction*, such that application of the two sections could be considered double-counting at all.  *See Dudley*, 463 F.3d at 1226–27.  There was no plain error here.

Looking next to substantive reasonableness, Babcock argues that the nature and circumstances of this case do not compel the same severe sentence required to deter creators of commercial child pornography.  Basically, Babcock contends that his crime—an inappropriate, long-term relationship with an older teenager— doesn't indicate that he is a threat to children generally or affect the child-pornography market as would, for instance, the rape of a child for video distribution or other predatory production of commercial child pornography. Babcock asserts that because there is no evidence that he intended ever to *show* anyone his videos or pictures of C.A., his 324-month sentence is substantively unreasonable.

We review challenges to the substantive reasonableness of a sentence for abuse of discretion.  *Gall v. United States*, 552 U.S. 38, 41 (2007).  The party

challenging the sentence bears the burden of showing that the sentence is unreasonable in light of the record and the 18 U.S.C. § 3553(a) factors. *United States v. Tome*, 611 F.3d 1371, 1378 (11th Cir. 2010). While we do not formally presume that a within-Guidelines sentence is reasonable, we ordinarily expect it to be so. *United States v. Hunt*, 526 F.3d 739, 746 (11th Cir. 2008). That a sentence is imposed well below the statutory maximum penalty may also indicate its reasonableness. *See United States v. Gonzalez*, 550 F.3d 1319, 1324 (11th Cir. 2008) (per curiam).

There is a certain intuitive logic to Babcock's argument here—it's true that nothing in the record necessarily indicates a propensity to distribute child pornography. That being said, Babcock's conduct falls squarely within the confines of § 2G2.1—"sexually exploiting a minor by production of sexually explicit visual or printed material"—and, as the sentencing judge emphasized, the effect of his actions on C.A. and her family was far from insignificant. We are comfortable that the sentencing judge took into consideration all of the relevant circumstances when he sentenced Babcock to 324 months—a downward variance from the 360 to 720 months recommended by the Guidelines. *See Gonzalez*, 550 F.3d at 1324. Accordingly, we find no abuse of discretion in the district court's sentencing decision.

31

## IV

For the foregoing reasons, we hold (1) that reasonable suspicion alone could not have justified the officers' warrantless two-day seizure of Babcock's cell phone; (2) that the officers in this case had probable cause to believe that a crime had been committed, that evidence of the crime would be found on Babcock's phone, and that there was a risk that Babcock would destroy the evidence before they could get a warrant, such that the seizure did not violate the Fourth Amendment; and (3) that Babcock's sentence was both procedurally and substantively reasonable. Accordingly, we affirm the district court's denial of Babcock's motion to suppress as well as its 324-month sentence.

**AFFIRMED.**