**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

JOSE LUIS ARELLANO-OCHOA,
        *Defendant-Appellant.*

No. 04-30545

D.C. No.
CR-04-00072-JDS

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

JOSE LUIS ARELLANO-OCHOA,
        *Defendant-Appellant.*

No. 05-30328

D.C. No.
CR-04-00164-JDS

OPINION

Appeal from the United States District Court
for the District of Montana
Jack D. Shanstrom, District Judge, Presiding

Argued and Submitted
January 11, 2006—Portland, Oregon

Filed August 31, 2006

Before: Andrew J. Kleinfeld, Susan P. Graber, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Kleinfeld

## COUNSEL

Jack E. Sands, Attorney at Law, Billings, Montana, for appellant Jose Luis Arellano-Ochoa.

James E. Seykora (argued), Assistant U.S. Attorney, Billings, Montana, for appellee United States of America.

## OPINION

KLEINFELD, Circuit Judge:

We publish to clarify Fourth Amendment law regarding the police opening a screen door without a search warrant. We also speak to dismissal without prejudice for a speedy trial violation.

### FACTS

Wyoming police caught an illegal alien headed to Arizona with $15,000 cash in the car. The car was registered to Daniel Priego of 640 Birch Lane, Billings, Montana. The driver, an illegal alien, claimed that he had been hired to drive the car to Arizona, deliver it to a woman who was going to "do something" with it, and then drive it to Montana and deliver it to the address on the car registration. He also said that there was an illegal alien at the Montana address. The police called U.S. Border Patrol in Montana to tell them that there was probably an illegal alien at the address at which the car was registered.

The Border Patrol agent went to the address for what he called a "knock and talk." Because he did not want to be without backup and he thought drugs might be involved,[1] he got a couple of Montana state narcotics investigators to go with him. All three investigators were in plainclothes and used unmarked cars. A young woman was sitting on the steps of the trailer smoking a cigarette and watching her two toddlers play. The Border Patrol agent identified himself and asked her if anyone else was there. She called into the trailer for "Daniel" or "Danny."

The screen door to the trailer was closed, though the solid door behind it was wide open. The screen door was mesh on the top half but solid metal on the bottom half, so visibility was limited to what could be seen through the top half. One of the narcotics detectives noticed that the usual furniture, such as a kitchen table, was missing—a fact that he found odd in a house with toddlers. As the Border Patrol agent went to knock, a man came toward the door. But instead of talking to the officers, the man swung the solid door almost shut, dodged quickly out of sight behind it, and the officers saw the blinds at the front window shut.

The Border Patrol agent immediately opened the screen door, pushed open the partially shut solid door, and started in. One of the narcotics detectives saw a .45 semi-automatic on the floor at the doorjamb (where the solid bottom half of the closed screen door had blocked it from view) and said "gun." The Border Patrol agent saw the man make a move toward the gun, and stepped between him and the gun. The agents quickly entered, subdued the man after a brief scuffle, and handcuffed him. A protective sweep of the house revealed evidence of drug dealing, so the officers obtained a search

---

[1]The agent testified that he thought there was an "obvious narcotic connection" because the Wyoming arrest "fit[ ] the typical profile of a courier-type run."

warrant and found cocaine, methamphetamine, a sawed-off rifle, and $1,000 in small bills.

It turned out that "Daniel Priego" was really appellant Jose Luis Arellano-Ochoa, an illegal alien. The border patrol agent opened the screen door because the man's "furtive" movements made the agent concerned for officer safety and the safety of the woman and toddlers nearby. After the man was subdued, the border patrol agent asked where he was born, and Arellano-Ochoa said "Mexico." The agent asked for identification, and Arellano-Ochoa pointed to the counter, where he had a Mexican driver's license, a Mexican border crossing card, and a permit for extension of the border crossing card.[2] The border patrol agent then knew that a crime was probable, because non-immigrant aliens, legal or not, generally are not permitted to possess firearms.[3] Arellano-Ochoa had not yet been "Mirandized." As the officers took Arellano-Ochoa away, he told his girlfriend he would need bail money and she reached into the diaper bag she had next to her. The officers quickly grabbed it to avoid danger and put it in the trailer. After they got a search warrant, they found about $1,000 in small bills in the diaper bag.

## ANALYSIS

### A.   The Search

The district court denied a motion to suppress the fruits of the search of the residence. The defense's theory was that the entry into the trailer was illegal and the search warrant was

---

[2]Arellano-Ochoa had a border crossing card for entering the United States within 25 miles of the border for a period of less than 72 hours. He also had an I-94 form, which permitted him to stay longer and go farther into the United States. All of the documents turned out to be forged, though the officers did not know that at the time. For purposes of this appeal, the point is that the documents meant that Arellano-Ochoa had permission to *visit* the United States rather than to immigrate here.

[3]*See* 18 U.S.C. § 922(g)(5)(B).

the fruit of the illegal entry, so all the evidence found in the residence should have been suppressed. We review the denial of the motion to suppress *de novo,*[4] and reach the same conclusion as the district court.

Arellano-Ochoa correctly points out that the officers did not know about the gun until after they opened his screen door with neither permission nor a warrant. He argues that his actions were reasonable because, from his point of view, some unidentified men came to his doorway and he had no obligation to keep his door open. This argument does not affect the result because the officer's entry must be evaluated objectively from the *officer's* point of view.[5]

**[1]** We first address whether opening the screen door has any Fourth Amendment significance. Whether opening a screen door breaches a reasonable expectation of privacy depends on the circumstances. During winter in a cold climate, people ordinarily keep the solid door shut. About the only way for mail and package delivery people, solicitors, missionaries, children funding school trips, and neighbors to knock on the door is to open the screen door and knock on the solid door. People understand that visitors will need to open the screen door, and have no expectation to the contrary. The reason why people do not feel that their privacy is breached by opening the screen door to knock is that it isn't; the solid door protects their privacy.

**[2]** In the summer, when people leave their solid doors open for ventilation, the screen door is all that separates the inside from the outside. People can get a resident's attention

---

[4]*See United States v. Willis*, 431 F.3d 709, 713 n.3 (9th Cir. 2005).

[5]*United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir. 1984) (en banc), *abrogated on other grounds as recognized in Estate of Merchant v. Comm'r*, 947 F.2d 1390 (9th Cir. 1991); *see also Mason v. Godinez*, 47 F.3d 852, 856 (7th Cir. 1995) ("[P]olice officers' belief that exigent circumstances existed is reviewed for its objective reasonableness.").

by knocking on the screen door without opening it. Where the solid door is wide open, the screen door is what protects the privacy of the people inside—not just their visual privacy, which it protects only partially, but also their privacy from undesired intrusion. Where the solid door is open so that the screen door is all that protects the privacy of the residents, opening the screen door infringes upon a reasonable and legitimate expectation of privacy. That is what happened here.

**[3]** The police cannot breach the reasonable expectation of privacy that people have in their homes without consent or a search warrant, unless one of the exceptions to the search warrant requirement applies.[6] Once the screen door was open and the officers spotted the gun, the legal distance to a justified entry was short indeed. But the gun was not spotted until after the agent opened the screen door. Where the screen door is the only barrier between the inside of the house and the outside, the police cannot open the screen door without consent or some exception. Arellano-Ochoa did not consent.

**[4]** We are satisfied, though, that exigent circumstances justified opening the screen door. Exigent circumstances justify a warrantless intrusion into a home where a reasonable officer "would believe that entry . . . was necessary to prevent physical harm to the officers or other persons."[7] Whether exigent circumstances exist in a given case is a fact-specific inquiry that depends on the totality of the circumstances.[8] Opening the screen door, spotting the gun, and rushing in between the gun and Arellano-Ochoa was not a "protective sweep," because it did not require the officers to search the premises or the

---

[6]*See Brigham City v. Stuart*, 126 S. Ct. 1943, 1947 (2006) (explaining principle and listing exceptions).

[7]*United States v. Gooch*, 6 F.3d 673, 679 (9th Cir. 1993); *see also LaLonde v. County of Riverside*, 204 F.3d 947, 958 (9th Cir. 2000) (exigency established when facts "present the officers with a threat to their safety").

[8]*See, e.g., United States v. Banks*, 540 U.S. 31, 36 (2003).

area outside Arellano-Ochoa's reach after they subdued him.[9] The critical warrantless intrusion in this case was opening the screen door, which occurred before the officers spotted the gun.

**[5]** This intrusion was justified by exigency, which was supplied by the background information on Arellano-Ochoa and his "furtive" movements. His quick dodge behind the door and closing of the blinds made it reasonable for the officers to conclude that there was a likelihood of danger to themselves, the woman, and the children. Arellano-Ochoa did not say "I prefer not to talk with you" or "You may not come in." He acted rather than talking. And he acted in a way that would suggest, even before they saw the gun, that the officers faced a risk of bullets flying where officers, a woman, and her toddlers were all within range.[10] Screen doors do not stop bullets.

Arellano-Ochoa argues for a different result under our decision in *United States v. Gooch*.[11] That case, though, is not analogous in the immediacy of the threat. Here, the threat was imminent. In *Gooch*, the police received a report about shooting in a campground at 3:50 a.m, and that there had been other such behavior between midnight and 2:00 a.m.[12] They assembled a mile away at 5:00 a.m., waited a considerable time for other officers, and did not approach the campground

---

[9]*Maryland v. Buie*, 494 U.S. 325, 327 (1990) ("A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others.").

[10]*See United States v. Salvador*, 740 F.2d 752, 756 (9th Cir. 1984) (exigency established where "window curtains rapidly close[d]" upon seeing police and officer believed "the occupants were getting ready to 'do battle' "); *see also Hegarty v. Somerset County*, 53 F.3d 1367, 1375 (1st Cir. 1995) (woman shooting rifle at campers and threatening police justified entry into home).

[11]*United States v. Gooch*, 6 F.3d 673 (9th Cir. 1993).

[12]*See id.* at 676.

until daylight, when the suspect was asleep in his tent.[13] After they had safely arrested the shooter and locked him in a patrol car 20 yards away from his tent, the officers searched the tent without a warrant.[14] We held that any exigency was gone because by the time the officers entered the tent, "there was no actual ongoing threat."[15]

In this case, a reasonable officer could have concluded (and did) that Arellano-Ochoa was a threat to them, the woman, and the toddlers out front. Their entry was therefore justified by exigency.

## B.   Other Suppression Issues

[6] Arellano-Ochoa argues that his statements before he was given a *Miranda* warning should have been suppressed. But the only pre-*Miranda* information the police got and used was where Arellano-Ochoa's identification was and where and when was he born. These are normal questions "attendant to arrest and custody," so *Miranda* is not implicated.[16] And "nothing in our case law prohibits officers from asking for, or even demanding, a suspect's identification."[17]

Arellano-Ochoa also argues that a protective sweep of the trailer after he was arrested and handcuffed was impermissible, and that any discoveries made during the sweep should have been suppressed. But the sweep was permissible under *Maryland v. Buie*[18] and our decision in *United States v. Alfonso*.[19]

---

[13]*See id.*

[14]*See id.*

[15]*Id.* at 679.

[16]*Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (excepting questions "normally attendant to arrest and custody").

[17]*United States v. Christian*, 356 F.3d 1103, 1106 (9th Cir. 2004).

[18]*Maryland v. Buie*, 494 U.S. 325, 334 (1990).

[19]*United States v. Alfonso*, 759 F.2d 728, 742-43 (9th Cir. 1985).

## C. The Speedy Trial Act

Arellano-Ochoa was not indicted until 38 days after his arrest. He should have been indicted within 30 days under the Speedy Trial Act.[20] The district court accordingly granted Arellano-Ochoa's motion to dismiss the indictment.

The argument arises because the dismissal was without prejudice. All the court said to justify allowing re-indictment instead of dismissing with prejudice was that, "although the Government violated the Speedy Trial Act by two days,[21] it was not egregious enough to order dismissal with prejudice."

[7] In *United States v. Pena-Carillo*,[22] we said that the district court must apply the three statutory factors and make factual findings when determining whether a Speedy Trial Act dismissal should be with or without prejudice.[23] The statute requires the district court to consider, "among others," the following factors: seriousness of the offense, circumstances leading to the dismissal, and impact of reprosecution on administration of the Speedy Trial Act and of justice.[24] In *Pena-Carrillo*, the district court erred by making no findings at all.[25] We nevertheless affirmed because the record sufficed for us to conclude that the district court's dismissal without prejudice was not an abuse of discretion.[26] Here, the district

---

[20]18 U.S.C. § 3161(b).

[21]Like most 18 U.S.C. § 3161 calculations, there is some complexity involved, and it appears that the government was eight days late rather than two days late. Arellano-Ochoa concedes that the difference between eight and two days was immaterial.

[22]*United States v. Pena-Carrillo*, 46 F.3d 879 (9th Cir. 1995).

[23]*See id.* at 882.

[24]18 U.S.C. § 3162(a)(1).

[25]*See Pena-Carrillo*, 46 F.3d at 882.

[26]*See id.* ("Although the district court failed to make factual findings" the record was "complete" and allowed the panel "to make the necessary findings.").

court *did* make a finding, though cursory. In the circumstances of this case—a brief and accidental delay by the prosecution in a case involving serious crimes—anything more would have been gilding the lily. The statute requires the judge to "consider" various factors, and the court's terse explanation that the violation was "not egregious enough" meant that the delay was neither lengthy nor flagrant, showing that it did consider the factors. Neither the statute nor any case requires written findings or a precise script when the court determines whether a speedy trial dismissal should be with or without prejudice. Though the district court must "consider" various factors, express discussion of each factor may be otious in circumstances such as this case. Here, it would not have added anything to have the judge going on in detail about whether possession with intent to distribute cocaine and methamphetamine, possession of firearms by an illegal alien, uttering a forged immigration document, and illegal reentry were serious crimes.

**AFFIRMED**.