DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**STATE OF FLORIDA,**
Appellant,

v.

**JEFFREY DARTER,**
Appellee.

No. 4D22-308

[November 2, 2022]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Kirk Volker, Judge; L.T. Case No. 502019CF011634AMB.

Ashley Moody, Attorney General, Tallahassee, and Sorraya M. Solages-Jones, Assistant Attorney General, West Palm Beach, for appellant.

Michael Salnick and Lisa Viscome of Law Offices of Salnick & Fuchs, P.A., West Palm Beach, for appellee.

GERBER, J.

After the state charged the defendant with possessing child pornography images, the defendant obtained the circuit court's order granting his motion to suppress the images. The defendant's motion to suppress successfully argued that although detectives had obtained a court-approved search warrant before finding the images on his cell phone, the detectives—two days earlier—had unlawfully seized his cell phone from his grasp without a warrant and allegedly without probable cause or exigent circumstances, thereby tainting the detectives' later court-approved search of his cell phone.

The state argues the circuit court erred in granting the defendant's motion to suppress. More specifically, the state argues the detectives were able to lawfully seize the defendant's cell phone from his grasp without a warrant for two reasons: (1) the detectives had probable cause that the defendant's cell phone contained child pornography images, based on the evidence which the detectives had discovered in their investigation, and based on the defendant's reaction upon the detectives confronting him with that evidence; and (2) exigent circumstances arose when the

defendant began swiping his cell phone in such a manner as to lead a reasonable person in the detectives' position to believe that the defendant was deleting the suspected evidence from his cell phone.

We agree with the state's arguments, and therefore reverse the circuit court's order granting the defendant's motion to suppress.

We present this opinion in five sections:

1. The evidence presented at the motion to suppress hearing;
2. The parties' arguments on the motion to suppress;
3. The circuit court's granting of the motion to suppress;
4. The parties' arguments on appeal; and
5. Our review.

## 1. *The Evidence Presented at the Motion to Suppress Hearing*

At the motion to suppress hearing, the state's sole witness was the investigation's lead detective, who testified as follows.

She had worked as a cyber-crimes detective for the past five years, and was part of the South Florida Internet Crimes Against Children task force. She primarily investigated child exploitation and pornography cases, for which she had received specialized training.

In June 2019, the Department of Homeland Security contacted her with a cyber-tip report regarding a person named Jeff Darter, who had "uploaded one image of child pornography … in the KIK chatting application." According to the lead detective, "KIK is similar to Snapchat. It's a social media chatting platform [on which] [p]eople can chat with each other in chat rooms. … They can chat privately, send messages privately, share images, videos, [etc.]."

The lead detective reviewed the uploaded image from the KIK account, and confirmed the image constituted child pornography. The KIK account revealed an associated email address. A subpoena for that email address's account turned up "J.D." as the subscriber's initials, and "Jeff Darter" as a listed alias.

The lead detective also was provided with the IP address from which the image was uploaded, and log-in records reflecting that the account had been accessed from the same IP address over a several-day period. The lead detective explained: "An IP … [or] internet protocol address … in layman's terms … [is] an address for [a person's] computer … [which is]

2

assigned to a router in [that person's] home specifically for [that person], usually no one else." According to the lead detective, an IP address can be tracked "to [a particular] residence or other location where somebody uploaded or was otherwise using the internet." After determining that Comcast was the internet provider for the subject IP address, the lead detective subpoenaed Comcast for the IP address's subscriber information. The subscriber was identified as Jeff Darter.

Using the subpoena results and cyber-tip information, the lead detective requested the state attorney's office to seek a residential search warrant for the defendant's residence. However, the state attorney's office denied the request, because the "Special Agent ... who originally served the subpoena on the IP address of the [image] upload ... listed the wrong date on the subpoena ... [by using] the log-in [date] as opposed to the [image] upload [date] ...." By the time the lead detective was able to serve Comcast with another subpoena using the correct image upload date, Comcast no longer had records for that date.

After the lead detective's residential search warrant request was denied, the lead detective made two unsuccessful "knock and talk" attempts at the defendant's residence.

The lead detective testified that she and a second detective then decided to go to the defendant's workplace. She conceded that, at that time, they did not have probable cause to get a search warrant for the defendant's cell phone or work computer. However, the lead detective was aware that, based on the nature of the defendant's employment, she would not need the defendant's consent to search his work computer.

When the lead detective and the second detective arrived at the defendant's workplace, they identified themselves to the defendant's supervisor. Without disclosing any details about their investigation, the detectives told the supervisor that they needed to speak to the defendant about an investigation. The detectives then went to the defendant's office, introduced themselves, and began recording their conversation with him. The circuit court admitted the recording into evidence without objection.

On the recording, the detectives read the defendant his *Miranda* rights, which the defendant acknowledged he understood. A fourteen-minute interview then occurred.

Because the interview's details, in conjunction with the events which occurred immediately after the interview, are crucial to our determination of whether probable cause and exigent circumstances existed for the

3

warrantless seizure of the defendant's cellphone from his grasp, we provide those details here (with emphasis added):

> LEAD DETECTIVE:  Do you have social media?
>
> DEFENDANT:  Uh, I have a Facebook page.  I don't ever use it but it's out there.
>
> LEAD DETECTIVE:  Do you have any others?
>
> DEFENDANT:  No.
>
> LEAD DETECTIVE:  What about chatting applications, like Snapchat, KIK?
>
> DEFENDANT:  I think I have those.  I don't think – I don't use them.  I do have accounts on Snapchat maybe and –
>
> LEAD DETECTIVE:  What about KIK?
>
> DEFENDANT:  *Not that I know of.*
>
> ….
>
> LEAD DETECTIVE:  Okay.  All right, so basically just to let you know why I am here today is that I received information from KIK, okay.
>
> DEFENDANT:  Okay.
>
> LEAD DETECTIVE:  That an image of child pornography was uploaded to another use from your account, your KIK account.
>
> DEFENDANT:  All right.
>
> LEAD DETECTIVE:  Can you tell me about that?
>
> DEFENDANT:  No.  *Like I said, I don't – don't use KIK.*  I don't know anything about that.  But I'm not a child pornographer, no.
>
> ….

4

LEAD DETECTIVE:  [D]o you know this email, [email address deleted here]?

DEFENDANT:  No.

LEAD DETECTIVE:  First name J.D.?

DEFENDANT:  Don't know that one.

LEAD DETECTIVE:  Okay.  But you did have KIK, right?

DEFENDANT:  *Yeah, I don't know.  I may still have it, I don't even know, but I don't use it.*

LEAD DETECTIVE:  What was the name that you used to –

DEFENDANT:  My God, I don't have any idea.

LEAD DETECTIVE:  Does  [username  matching  e-mail address] ring a bell?

DEFENDANT:  No.

LEAD DETECTIVE:  Okay.  So, let's see, it looks like, I mean, this is directly from KIK.

DEFENDANT:  Okay.

LEAD DETECTIVE:   All right.  And it shows your username is [username deleted here], first name Jack Darten.  But then it shows you changed your name the end of December of 2015 to Jeff Darten.[1]

DEFENDANT:  Again, 2015?

LEAD DETECTIVE:  Yes.

DEFENDANT:  *Okay, maybe.  I don't know.*

LEAD DETECTIVE:  Okay.  So, I mean, [KIK] reported from – directly  from  them  that  you  uploaded  an  image  of  child

---

[1] The state argued the defendant had intentionally changed his first name and then misspelled his last name in an attempt to disguise his identity.

pornography in the beginning of December [2018], and they shut down your account.

DEFENDANT: Like I said, I don't know any of that. I don't know what they are – where that's coming from.

LEAD DETECTIVE: Was your KIK account ever deactivated?

DEFENDANT: *I don't know.*

LEAD DETECTIVE: Okay.

DEFENDANT: *I don't think I've ever even used it, but obviously I did something in 2015, so.*

LEAD DETECTIVE: I mean, it shows you were using it last year from November [2018] on.

DEFENDANT: Last year?

LEAD DETECTIVE: Uh-huh. Have you ever seen child pornography before?

DEFENDANT: I have, yeah.

LEAD DETECTIVE: Okay. Where?

DEFENDANT: Friends, other friends.

LEAD DETECTIVE: Other friends.

DEFENDANT: Yeah.

LEAD DETECTIVE: Okay.

DEFENDANT: Yeah.

LEAD DETECTIVE: Tell me more about that. Can you be more specific?

DEFENDANT: No, not really. I mean, just to say that other people have had stuff that they have shown me and –

6

LEAD DETECTIVE: Could this have been something like that, something you came across to show one of your friends, being that they are into that type of material?

DEFENDANT: I don't – no, I don't have that stuff. I've seen it from other people but I don't have any of it.

LEAD DETECTIVE: Okay.

DEFENDANT: So –

LEAD DETECTIVE: Who are these people that are interested in this material?

DEFENDANT: Well, it was years ago. Nobody I even could name. I just – people have shown me things.

LEAD DETECTIVE: Okay. Close friends, or, I mean, how many people are we talking?

DEFENDANT: Acquaintances, yeah. I mean, people that I have worked with, yeah.

LEAD DETECTIVE: How does that come up?

DEFENDANT: Uh, I don't know. Just –

LEAD DETECTIVE: How does that come up in conversation?

DEFENDANT: Yeah, yeah, that's the thing, yeah. Some things that they have shown me that I was not interested in, yeah, yeah.

LEAD DETECTIVE: Okay. When was the last time?

DEFENDANT: Uh, I don't even know[].

LEAD DETECTIVE: All right. What is child pornography to you? What does that mean to you?

DEFENDANT: Well, I guess it would be like underage children or something.

LEAD DETECTIVE: Engaged in –

7

DEFENDANT: Yeah, doing – unclothed or whatever.

LEAD DETECTIVE: In sexual conduct, things of that nature?

DEFENDANT: Oh, okay. All right.

LEAD DETECTIVE: Okay. The image that you sent to someone was an infant being penetrated by an adult male –

DEFENDANT: Okay.

LEAD DETECTIVE: – from your account. Just one image, not several. So we just want to make sure there is, you know, not anymore and you're not actually hands on with anybody. It's just something you've looked at.

DEFENDANT: No, and like I said, I don't even know about that. I don't know anything about that, but, you know, it's not my – it's not interesting to me at all. It's not my thing.

LEAD DETECTIVE: Okay.

SECOND DETECTIVE: This was something that was done accidentally and you didn't realize what you did or is this —

DEFENDANT: *Like I said, I don't know. I don't even know anything about that. It could have been, I guess, but I don't have any knowledge of that.*

LEAD DETECTIVE: Who is your internet service provider? Is it Comcast?

DEFENDANT: Comcast, I think, yeah.

LEAD DETECTIVE: How long have you had Comcast?

DEFENDANT: Probably five or six years, something like that.

LEAD DETECTIVE: So these people that you say you are friends with that are interested in this material, you met them at work. Where was that?

8

DEFENDANT:  Well, that was – the one person I can think of, that was twenty years ago ….  [He] w[as] starting a website to do that kind of thing and –

….

LEAD DETECTIVE:   What do you mean, starting a website?

DEFENDANT: This person had a website that did pornography of all kinds and I – he was showing me his website.  I was not amused.

LEAD DETECTIVE:   Who is this friend?

DEFENDANT:  I would rather not tell you that.

LEAD DETECTIVE:   Why would you protect someone who is interested in child pornography?

DEFENDANT: I'm not protecting them.  …  It was twenty years ago.  I'm sure they're not doing it any more.

LEAD DETECTIVE:   I highly doubt that.

DEFENDANT:  I highly doubt they are, but whatever.  You're welcome to your opinion.

LEAD DETECTIVE:   So when you – obviously you would use your phone to access KIK because you can't on the computer.  You are telling me you don't have any child pornography whatsoever?

DEFENDANT:  No.

LEAD DETECTIVE:  Would you consent to search your phone right now?

DEFENDANT:  Not right now, no.

LEAD DETECTIVE:   Why not?

DEFENDANT:  I think that requires something more than just my giving you permission, right?

LEAD DETECTIVE:   No.

DEFENDANT:  Well, I've decided – I choose not to give you permission to get onto my phone.

LEAD DETECTIVE:  Okay.  So there's likely evidence of child pornography on your phone?

DEFENDANT:  I'm not saying that at all.  I just don't think I want to give you permission to get into my phone.

LEAD DETECTIVE:   Well, it wouldn't be me.  It would be my forensic team that I have outside to look at it.

DEFENDANT:  No, thanks.

LEAD DETECTIVE:   Okay.  Do you have any questions for me?

DEFENDANT:  No.

....

LEAD DETECTIVE:  Do you swear the information you provided to me today was the truth?

DEFENDANT:  Absolutely.

LEAD DETECTIVE:   Okay.  [To the second detective] Can you think of anything else?

....

SECOND DETECTIVE:   Actually, real quick, so if it's not you, then it's going to probably be your wife that is doing this or – because it came from your house with your account, so.

DEFENDANT:  I don't know.

SECOND DETECTIVE:   Okay.  Have you ever seen your wife watch child pornography?

DEFENDANT:  No.

10

....

LEAD DETECTIVE: Okay. You know, like [the second detective] said, it was uploaded from your residence[,] so it was either you or your wife and that's what we need to get to the bottom of. Your name is all over – well, your name, Jeff Darter is on that account, but if you are saying that's not you and you didn't do that, then that's something we are going to have to talk with her about.

DEFENDANT: Okay.

....

LEAD DETECTIVE: And just so you are aware, we've been alerted now that you've done this so you are on our radar with the Sheriff's Office. So if you are still doing so, I suggest you stop.

DEFENDANT: Okay.

LEAD DETECTIVE: Because if we are alerted again that you were possessing, transmitting child pornography, you're going to have a major issue.

DEFENDANT: Yeah, well, it shouldn't happen, but thank you.

At that point, the detectives concluded the recorded interview. The lead detective testified that the defendant's demeanor during the interview was "[o]ddly calm." The two detectives then left the defendant's office. The detectives did not tell the defendant whether they would be coming back or that he was prohibited from doing anything with his cell phone.

The two detectives then went to the defendant's supervisor's office to request the supervisor's consent to search the defendant's work computer. The supervisor consented. The two detectives, joined by the supervisor and a third detective who specialized in forensic computer examination, went back to the defendant's office.

Upon entering the defendant's office, the lead detective told him that the detectives needed to look at his work computer. The defendant initially refused to get up from his desk. The defendant's supervisor demanded that the defendant get up from his desk. The defendant did so and went

from his office to a nearby break room which was visible to the lead detective. None of the detectives accompanied the defendant into the break room or told him that he could not do anything with his cell phone.

However, the lead detective remained interested in looking at the defendant's cell phone, if she could do so legally. So, while the lead detective watched the third detective begin examining the defendant's work computer, she "maintain[ed] a visual" on the defendant in the break room for what she approximated was less than ten minutes.

According to the lead detective, while the defendant was in the break room, she eventually noticed "[h]e was shaking. He was frantically swiping and pressing on [his cell phone's] screen." His demeanor "was the exact opposite [from the interview]. … [H]e was swiping, deleting, extremely nervous. It wasn't a normal appearance." The lead detective could not tell exactly what the defendant was doing with his phone, but she suspected that "he [was] deleting evidence." (The trial court overruled defense counsel's "speculation" objection to that observation.)

Based on the lead detective's suspicions, she and the second detective approached the defendant in the break room, and asked (or told) him to turn over his cell phone. The defendant said "no," at which point the lead detective "grabbed [the cell phone] out of his hand." The defendant then "pushed [the lead detective] and tried to grab the phone out of [her] hand." A struggle ensued between the defendant and the two detectives. The lead detective ultimately seized the phone, and arrested the defendant for two counts of battery on a law enforcement officer.

Over the next two days, the lead detective drafted an application for a warrant to search the defendant's cell phone's contents. Meanwhile, the search of the defendant's work computer revealed adult pornography images, self-pornographic images taken at his work station, and one pornographic image of a person whom the detectives could not determine was a teenage child or an adult. The lead detective included these details in the application for a warrant to search the defendant's cell phone.

The duty judge approved the search warrant application. The detectives searched the defendant's cell phone and discovered 174 child pornography files.

### 2. *The Parties' Arguments on the Motion to Suppress*

The defendant's motion to suppress primarily argued that the lead detective had unlawfully seized his cell phone from his grasp without

probable cause that the cell phone contained child pornography images, and that the lead detective had "created the [exigent] circumstances which le[d] to" the phone's seizure without a warrant. According to the defendant's motion: "The seizure of the defendant's cell phone was unlawful and any evidence obtained as a result of the seizure must therefore be suppressed. The warrant obtain[ed] subsequent to the unlawful seizure d[id] not cure the unlawful conduct."

The state's response argued that the pre-interview evidence which the lead detective had discovered—linking the defendant to the KIK account to which the child pornography image had been uploaded—combined with the defendant's reaction upon the detectives confronting him with that evidence, gave the lead detective probable cause to believe that the cell phone contained child pornography images. Further, the state argued, the exigent circumstances of the defendant potentially deleting evidence on his cell phone "was created by the [d]efendant's actions, not the police," and justified the lead detective's warrantless seizure of the cell phone. "Importantly," the state's response asserted, "the cell phone ... was only seized, not *searched*[,] prior to obtaining a warrant."

During the hearing on the motion, the state acknowledged the lead detective did not have probable cause to seize the defendant's cell phone "[p]rior to [interviewing] him." However, the state reiterated that the information which the lead detective had acquired before the interview, "coupled with [the defendant's] answers to her [interview] questions and then his subsequent behavior, ... gave her probable cause to seize the phone and apply for a [search] warrant." The state elaborated:

> This is someone who has now been informed [that he is] a target of an investigation, that these are the allegations, ... this is the information we have leading back to [him].
>
> He appears calm speaking with [the lead detective]. He then becomes resistant when he knows she is going to search [his work computer], goes to the break room, is left alone for the first time, completely changes his demeanor, [which] alerts her that something is going on. And that is why ... she seized ..., and ... had [probable cause] to seize[,] the phone at that time.

In rebuttal, defense counsel maintained that the lead detective lacked probable cause to believe that child pornography images were on the defendant's cell phone:

Up to that point, the focus was … trying to get a warrant for his residence based on an IP address to that residence, not to a particular device ….  So there was absolutely no evidence leading to the [defendant's] [cell] phone, other than the fact that KIK is a [cell] phone application.  …  The[] [detectives] don't have evidence of images, downloading or anything in particular to that particular phone at the time that they go to [the defendant's] office.  They are also acting on information that at that point is eleven months old.

Defense counsel then argued that the defendant's behavior did not create exigent circumstances for the lead detective's warrantless seizure of the defendant's cell phone:

It just defies logic that [the lead detective] would sit down with [the defendant], tell him why she is there, and wait for that long period of time, … and then leaving him alone …, to conduct this forensic search, and then not until the very end decides that he is acting nervously.  And acting nervously in and of itself is not sufficient.  Obviously, she is going to speculate that he was deleting.  … [S]he thought he was swiping.  That could be … consistent [with] … [a] message coming up, I'm swiping it off because … I'm in the middle of work and I'm being investigated by law enforcement.  It's just as similar to … completely innocent activity as it is to destruction of evidence.  …

### 3. *The Circuit Court's Granting of the Motion to Suppress*

The circuit court orally granted the defendant's motion to suppress:

[T]o seize a cell phone under exigent circumstances, there must be probable cause existing at the time that the phone is seized … when there is no search warrant in order for it to be a lawful seizure.  … [T]he [lead] detective herself has testified that at the time she went to the [defendant's] [workplace] to speak with [the defendant], she did not have probable cause to obtain a search warrant ….  Once she got there, after speaking with [the defendant], I do not believe that his answers to her questions would have provided the necessary probable cause.  And then once he left the room, went into the break room and started accessing his cell phone, I don't believe that, even assuming arguendo that that activity, if she had probable cause, would have permitted her to take the

14

phone under exigent circumstances, I think that activity itself does not provide additional probable cause to believe child pornography would be found on that phone. *There are a lot of reasons why somebody could be using their phone.* [*The lead detective*] *can't say what* [*the defendant*] *was doing. She can't say he was deleting anything.* And I'm not even sure if she could have said he was deleting anything, if that would have given probable cause to believe there is child pornography on the cell phone. But to sum up my findings, I do not believe there was probable cause to seize that phone at the time she took it; therefore, I don't even think I need to address the exigent circumstances because you need probable cause to seize a cell phone under exigent circumstances. I don't disbelieve the testimony of [the lead detective]. I think she was very credible ….

....

So those are my rulings. Exigent circumstances, I think if [the lead detective] had probable cause, and *maybe the Courts on an appeal would say … the* [*circuit court*] *is wrong, there was probable cause to seize the phone, I find that there were exigent circumstances to seize it, but I wasn't finding probable cause before those circumstances existed.* So I don't think she had the right to seize it.

(emphasis added). The circuit court later entered a written order summarizing its ruling, but deferring a finding on whether exigent circumstances existed to seize the defendant's cell phone:

This Court finds there was no probable cause to seize the [d]efendant's cell phone at the time [the lead] [d]etective … took the phone. Based upon this finding, the Court does not need to address the exigent circumstance argument, for the [lead] [d]etective would need probable cause to seize the phone under exigent circumstances. …

Accordingly it is … ORDERED that the [d]efendant's … [m]otion be GRANTED and that all items seized and taken from the [d]efendant's … cell phone are hereby suppressed.

### 4. *The Parties' Arguments on Appeal*

On appeal, the state summarizes its primary argument as follows:

15

Based on the totality of the circumstances, the [circuit] court erred in granting [the defendant's] motion to suppress the 174 child pornography images found on his cell phone.

… [A]t the time [the lead detective] seized [the defendant's] cell phone she believed, as an objectively reasonable officer, that there was a fair probability child pornography was on the phone. Hence, [she] had to respond quickly to the exigent circumstances for fear that [the defendant] was deleting or destroying evidence … [while] law enforcement was searching his work computer.

The defendant's answer brief summarizes his response as follows:

In order for law enforcement to lawfully seize [the defendant's] cell phone without a warrant, the [s]tate ha[d] the burden of showing at the time of the seizure law enforcement had both probable cause to believe that property contain[ed] … evidence of a crime and an applicable warrant exception, such as exigent circumstances. [The lead detective] lacked probable cause that [the defendant's] cell phone contained evidence of a crime at the time she grabbed it from his hand. The seizure [therefore] was unlawful.

### 5. *Our Review*

We employ a mixed standard of review. *See State v. Hankerson*, 65 So. 3d 502, 506 (Fla. 2011) ("In reviewing a trial court's ruling on a motion to suppress, the appellate courts defer to the trial court's factual findings so long as the findings are supported by competent, substantial evidence, and *review de novo the legal question of whether there was probable cause given the totality of the factual circumstances*.") (emphasis added).

Here, applying de novo review to the legal question of whether the lead detective had probable cause to believe that child pornography images were on the defendant's cell phone, we conclude the trial court erred in finding a lack of probable cause.

As the Eleventh Circuit stated in *U.S. v. Babcock*, 924 F. 3d 1180 (11th Cir. 2019):

[T]he Supreme Court has interpreted the Fourth Amendment to allow a warrantless seizure when police can show both (1)

16

probable cause to believe that property contains contraband or evidence of a crime and (2) an applicable warrant exception, such as exigent circumstances. *See, e.g.*, *Kentucky v. King*, 563 U.S. 452, 459–60 … (2011) (citations omitted). Accordingly, absent either a warrant or probable cause plus an exception, police may not seize private property.

*Id.* at 1186 (11th Cir. 2019).

In the following two subsections, we will first address the probable cause requirement, and then we will address the exigent circumstances exception to the warrant requirement, as applied to the facts here.

### *Probable Cause*

As the United States Supreme Court stated in *Texas v. Brown*, 460 U.S. 730 (1983):

[P]robable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would warrant a [person] of reasonable caution in the belief that certain items may be … useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A practical, nontechnical probability that incriminating evidence is involved is all that is required. Moreover, our observation in *United States v. Cortez*, 449 U.S. 411, 418, 101 S. Ct. 690, 695, 66 L. Ed. 2d 621 (1981), regarding "particularized suspicion," is equally applicable to the probable cause requirement:

The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

460 U.S. at 742 (other internal citations and quotation marks omitted).

Applying that standard of review, we conclude the lead detective—based upon the combination of her pre-interview investigation, the defendant's responses during the interview, and the defendant's post-interview behavior in the break room—had probable cause to believe that the defendant's cell phone contained child pornography images.

While the state acknowledged the lead detective lacked probable cause to seize the defendant's cell phone *before* the interview at the defendant's workplace, the state later argued that the information which the lead detective had acquired *before* the interview, combined with the defendant's answers *during* the interview, and his behavior *after* the interview, provided probable cause to believe that the defendant's cell phone contained child pornography images.

Indeed, *before* the interview, the lead detective had the following information:

- The Department of Homeland Security had received a cyber-tip report regarding a person named Jeff Darter, who had uploaded one image of child pornography in the KIK chatting application.

- Based on the lead detective's review of the uploaded image from the KIK account, the image constituted child pornography.

- The KIK account revealed an associated email address for which the account subscriber's initials were "J.D." and for which a listed alias was "Jeff Darter."

- The IP address from which the child pornography image was uploaded and log-in records reflected that the account had been accessed from the same IP address over a several-day period.

- After determining that Comcast was the internet provider for the subject IP address, the lead detective learned from Comcast that the IP address's subscriber name was Jeff Darter.

*During* the interview, the lead detective confirmed that the defendant had maintained a Comcast account. The lead detective also acquired more information for probable cause consideration:

- When the lead detective first asked the defendant if he ever had the KIK chatting application, the defendant answered, "Not that I know of." When the lead detective then added into a later question that

"an image of child pornography was uploaded to another use from your account, your KIK account," the defendant doubled down on his denial of a KIK account, answering, "Like I said, I don't – don't use KIK. I don't know anything about that."

- However, just a few minutes later, the defendant's denial of having or using a KIK account changed to acknowledging the possibility of at least having had a KIK account. When the lead detective told the defendant that the KIK account was associated with the name "Jeff Darten" (just one letter off from the name "Darter"), the defendant answered, "Okay, maybe. I don't know."

- Then, just a few seconds later, the defendant acknowledged the possibility of having used a KIK account. When the lead detective asked the defendant, "Was your KIK account ever deactivated?", the defendant answered "I don't know ... I don't think I've ever even used it, *but obviously I did something in 2015*, so." (emphasis added).

- Following the rapid evolution of the defendant's answers regarding the KIK account, the defendant then gave evolving answers about whether he had ever seen child pornography images. The defendant answered he had been shown child pornography by people whom he first described as "friends," and then as "acquaintances," and then as "people that I have worked with." When the lead detective asked, "How does that come up in conversation?", the defendant's answer was nonresponsive, if not nonsensical: "Yeah, yeah, that's the thing, yeah. Some things that they have shown me that I was not interested in, yeah, yeah." When the lead detective then asked, "When was the last time?", the defendant answered "Uh, I don't even know[]." A few minutes later, when the lead detective asked the defendant where he had met friends at work who were interested in "this material," he now explained the event occurred "twenty years ago" when a friend was "starting a website ... that did pornography of all kinds and I – he was showing me his website." When the lead detective asked the defendant to identify the friend, the defendant refused to do so, presumptively stating, "It was twenty years ago. I'm sure they're not doing it any more."

- In the middle of the defendant's evolving and evasive answers about whether he had ever seen child pornography, the lead detective expressly told the defendant, "the image that you sent to someone was an infant being penetrated by an adult male" and she wanted "to make sure there is, you know, not anymore and you're not actually hands on with anybody. It's just something you've looked

at." At first, the defendant denied having seen the image, stating, "No, and like I said, I don't even know about that. I don't know anything about that, but, you know, it's not my – it's not interesting to me at all. It's not my thing." But when the second detective began asking the defendant if "[t]his was something that was done accidentally and you didn't realize what you did," the defendant interrupted the question to change his answer to acknowledging the possibility of having seen the image: "Like I said, I don't know. I don't even know anything about that. *It could have been, I guess,* but I don't have any knowledge of that." (emphasis added).

- At that point, the lead detective asked for the defendant's consent to search his phone. The defendant refused. The detectives then warned the defendant that because the image had been uploaded from his residence, "then that's something we are going to have to talk with [your wife] about," "you are on our radar," and "if we are alerted again that you were possessing, transmitting child pornography, you're going to have a major issue." After the first and second statements, the defendant merely responded "okay," but ultimately responded to the third statement, "Yeah, well, it shouldn't happen, but thank you."

*After* the interview—which the detectives concluded by telling the defendant that they were going to speak with his wife—his "oddly calm" behavior rapidly changed:

- When the detectives returned to the defendant's office and told him that they needed to look at his work computer, he initially refused to get up from his desk. The defendant's supervisor had to demand him to get up from his desk.

- Then, in less than ten minutes, while the defendant was in the break room, the lead detective eventually noticed "[h]e was shaking. He was frantically swiping and pressing on [his cell phone's] screen." His demeanor "was the exact opposite [from the interview]. … [H]e was swiping, deleting, extremely nervous. It wasn't a normal appearance." Although the lead detective could not tell exactly what the defendant was doing with his cell phone, she suspected that "he [was] deleting evidence."

Applying the United States Supreme Court's standard of review stated in *Texas v. Brown*, we conclude the combination of facts available to the lead detective *before*, *during*, and *after* the interview would "warrant a [person] of reasonable caution in the belief," 460 U.S. at 742, that the

20

defendant's cell phone contained evidence of child pornography images. While we cannot say that such a belief would have been "correct or more likely true than false," we can apply our common sense to say that the information which the lead detective had gathered and observed reasonably would have provided her with a "practical, nontechnical probability" that incriminating evidence would be found on the defendant's cell phone.  *See id.*

The circuit court's error in finding a lack of probable cause appears to have occurred when its reasoning deviated from the Supreme Court's articulated standard of review.  Rather than focusing on the *probability* of the lead detective's belief that the defendant was frantically deleting evidence from his cell phone, the circuit court inadvertently focused on the lead detective's inability to prove the *certainty* of her belief.  As the circuit court reasoned, "There are a lot of reasons why somebody could be using their phone.  [*The lead detective*] *can't say what* [*the defendant*] *was doing. She can't say he was deleting anything.*" (emphasis added).  The circuit court's focus on *certainty* rather than *probability* ran counter to the Supreme Court's process for determining probable cause, especially given the lead detective's specialized training and experience in cyber-pornography crimes against children.  *See id.* ("The process does not deal with hard certainties, but with probabilities … as understood by those versed in the field of law enforcement.").

*Exigent Circumstances*

"The test of whether exigent circumstances exist is an objective one." *United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir. 1991).  "Whether exigent circumstances exist in a given case is a fact-specific inquiry that depends on the totality of the circumstances."  *United States v. Arellano-Ochoa*, 461 F.3d 1142, 1145 (9th Cir. 2006) (citing *United States v. Banks*, 540 U.S. 31, 36 (2003)).  As the United States Supreme Court stated in *Banks*:

> [W]e have treated reasonableness as a function of the facts of cases so various that no template is likely to produce sounder results than examining the totality of circumstances in a given case; it is too hard to invent categories without giving short shrift to details that turn out to be important in a given instance, and without inflating marginal ones.  *See, e.g., Ohio v. Robinette*, 519 U.S. 33, 39 … (1996) ("[W]e have consistently eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry"); *Ker v. California*, 374 U.S. 23, 33 … (1963) (reasonableness not

susceptible to Procrustean application); *Go-Bart Importing Co. v. United States*, 282 U.S. 344, 357 … (1931) (no formula for determining reasonableness; each case on its own facts and circumstances).

540 U.S. at 36.

One type of exigent circumstance is the imminent destruction of evidence, to which we also have applied an objective test:

> The government must show more than a subjective fear of imminent destruction of evidence; the fear must be objectively reasonable. In determining whether the agents reasonably feared imminent destruction of the evidence, the appropriate inquiry is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced agent to believe that evidence might be destroyed before a warrant could be secured. In other words, "were the police unreasonable in not getting a warrant in the circumstances that confronted them?"

*Gilbert v. State*, 789 So. 2d 426, 429 (Fla. 4th DCA 2001) (quoting *United States v. Rivera*, 825 F.2d 152, 156 (7th Cir. 1987)).

Application of the exigent circumstances exception is "particularly compelling" in cases involving electronic files, which can easily and quickly be destroyed. *Babcock*, 924 F.3d at 1194; *cf. United States v. Bradley*, 488 Fed. Appx. 99, 103 (6th Cir. 2012) ("Courts have doubted the wisdom of leaving the owner of [an] easily-destructible [electronic device containing incriminating material] in possession of that [electronic device] once the owner is aware that law-enforcement agents are seeking a search warrant.").

Applying the above standards to the instant case, we conclude the facts would have led a reasonable, experienced agent—here, the lead detective—to believe that the defendant might be destroying incriminating evidence on his cell phone before a search warrant could be secured. After the defendant had been (1) confronted by the detectives with the evidence against him, (2) warned "that's something we are going to have to talk with [your wife] about" and "you are on our radar," and (3) ordered from his desk while the detectives searched his work computer, the defendant went into a nearby break room, where the lead detective saw him "shaking," "frantically swiping and pressing on [his cell phone's] screen," exhibiting demeanor which "was the exact opposite [from the interview]," and "swiping, deleting, extremely nervous," in what "wasn't a normal

appearance." Faced with those circumstances, the lead detective was not unreasonable in seizing the defendant's cell phone until she could secure a search warrant for the cell phone.

In reaching our decision, we reject the defendant's argument that the detectives' actions created the exigent circumstances leading to the warrantless seizure of his cell phone. Neither the detectives' interview of the defendant, nor their on-site search of his work computer with his supervisor's consent, constituted "engaging or threatening to engage in conduct that violates the Fourth Amendment." *Kentucky v. King*, 563 U.S. 452, 462 (2011). Instead, as the state's initial brief submits:

> Based on [the defendant's] behavior in conjunction with the information [which the lead detective] gathered … up to the point of seizure as well as her experience with how quickly the evidence could be deleted, [the lead detective] objectively believed and feared that [the defendant] was deleting or destroying evidence of child pornography at the … time[] that law enforcement began forensically searching [the defendant's] work computer (which ultimately revealed evidence of age-difficult … pornography). Therefore, seizing [the defendant's] cell phone under these exigent circumstances was justified.

### *Conclusion*

In sum, we conclude the lead detective lawfully seized the defendant's cell phone without a warrant, based upon probable cause and exigent circumstances. We therefore reverse the circuit court's order granting the defendant's motion to suppress, and remand for the circuit court to enter an order denying the defendant's motion to suppress.

As a result of our conclusion above, we do not reach the state's alternative arguments that the search warrant rendered the evidence admissible under the independent source doctrine, and that the circuit court erroneously conducted a de novo review of the duty judge's determination that the search warrant affidavit contained sufficient probable cause. We also conclude that the defendant's alternative arguments seeking affirmance lack merit, without further discussion.

*Reversed and remanded for proceedings consistent with this opinion.*

MAY and FORST, JJ., concur.

*        *        *

*Not final until disposition of timely filed motion for rehearing.*