# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D2023-2175

_____

STATE OF FLORIDA,

    Appellant,

    v.

QUINTON M. REDDICK,

    Appellee.

_____

On appeal from the Circuit Court for Leon County.
Joshua M. Hawkes, Judge.

July 9, 2025

KELSEY, J.

    This appeal raises a Fourth-Amendment issue in a child pornography case. Before this case arose, Appellee was on probation as a registered sex offender for traveling to meet a minor to commit an unlawful sexual act. This case involves multiple new child-pornography charges. Appellee moved to suppress evidence of child pornography found on his electronic devices. The trial court found one argument valid among the many that Appellee raised, and granted the motion to suppress, rejecting the State's argument that the independent source doctrine saved the evidence from suppression. We reverse.

**Facts**

The Tallahassee Police Department (TPD) received a tip from the National Center for Missing and Exploited Children (NCMEC), linking child pornography to Appellee. NCMEC provided TPD a picture featuring a very young male child, which NCMEC, TPD, and ultimately the trial judge found to constitute child pornography. NCMEC gave TPD information identifying the Snapchat account to which the picture had been uploaded, as well as the user's phone number, date of birth, e-mail address, and user name. These matched the information Appellee had provided on his Florida sex offender registration form. TPD, therefore, knew that information in advance, and thus also knew that Appellee had a cell phone, an e-mail address, and internet access. The internet protocol (IP) address was traced to a virtual private network (VPN) provider, a service that can be used to disguise the actual physical location of online activity.

The TPD officer assigned to the case wanted to make sure it was Appellee's account. In mid-afternoon, two TPD officers went to Appellee's registered address. One officer's body-worn camera (BWC) recorded the encounter. There was no immediate response to the officer's first knock. Appellee answered the officer's second knock almost a full minute after the first knock, appearing sleepy or as if the light hurt his eyes. The door opened directly onto a staircase. Leaving the entrance door open, Appellee stepped outside. The officer explained the purpose of the visit as verifying Appellee's information on his sex-offender registration, and asked if Appellee minded if the officers entered the apartment. Appellee first said they could come in, and started upstairs, then turned around and said he did mind—but again left the door open. The officer asked for Appellee's ID, and Appellee said he needed to go upstairs and get his keys because the ID was in his car. As he turned toward the stairs, his smart watch rang. He looked at it for a couple of seconds, pushed a button on it, then started up the stairs, before the officer called him back for more questioning. Appellee stepped fully outside and closed the door behind him.

Appellee answered questions confirming his identity, date of birth, phone number, e-mail address, internet provider, and status as a sex-offender probationer. He appeared dubious about why

TPD was conducting this check rather than the Sheriff's Office, and said he had already updated his information as required for his change of address. He confirmed his telephone number and e-mail address—both of which were connected to the Snapchat account on which the pornographic image was flagged—and confirmed his social media identification and his internet provider. He said no one lived with him, and he was working two jobs: at Best Buy and a communications company. The officer then instructed Appellee to turn around to be handcuffed, and—importantly for resolving the issue on appeal—explained that he was going to detain Appellee and secure the apartment in anticipation of obtaining a search warrant.

Footage from the officer's BWC showed him going up the stairs, announcing his presence, and asking if anyone was inside. He opened a utility closet at the top of the stairs, shone a flashlight into the bathroom through its open door, opened the door to a clothes closet adjoining the bathroom, opened a closet containing a stacked washer and dryer, and looked around at the main living area. The apartment was a small one-room studio in which two electronic-device screens or monitors were in plain view. The larger one was positioned on a stand against the wall at the foot of the bed, and appeared to be a TV. The other was smaller, on a desk beside the bed. Both screens were black and blank as if powered off. The officer did not open any cabinets, drawers, or anything else that could function as a container. He did not scrutinize or touch anything connected to the two screens, nor any other objects in the apartment. He turned to look all around the room, then returned to the head of the stairs and called for his partner to bring Appellee up.

The first officer seated Appellee at the card table, explaining again that they were going to get a search warrant. He advised Appellee of his *Miranda* rights and asked if he still wanted to talk or not. Post-*Miranda*, Appellee asked what was going on. The officer explained that they had some information about online activity, specifically images on Snapchat, more specifically child pornography, tied to Appellee on an account other than the "MarcusQ" one. The officer was the first to mention "MarcusQ." Appellee said "never happened—no." The officer asked how it was that Appellee's account was tied to child pornography, and

3

Appellee said he would wait for a lawyer before talking further. The officer again said he was about to apply for a search warrant and advised Appellee he was probably going to be charged for transmitting child pornography. Appellee said someone was setting him up. The officer went downstairs to get his computer out of his car, and turned off his BWC. It is undisputed that both officers sat in the apartment with Appellee while writing a warrant application and waiting for the warrant, which together took about an hour and twenty minutes.

Significantly, the requesting officer disclosed in the warrant application that he had performed a protective sweep: "I secured the residence to ensure no one else was present in the home in anticipation of applying for a search warrant." The application also noted that Appellee had first confirmed his phone number and e-mail address, both of which were connected to the suspect Snapchat account, before the officer entered the apartment. The officer did not disclose in the warrant application anything that he saw inside the apartment. Nothing that Appellee said after being detained was disclosed in the search warrant.

The officer testified at the suppression hearing that based on the information already available to him, he assumed in advance that there would be computers and other electronics in the apartment. He said it is standard practice to include in a warrant application all devices that could contain electronic images, because many different devices can store media and images. He considered the sweep necessary "to ensure that no one else was inside the residence who could destroy evidence of this investigation such as computers, laptops, tablets, phones, USBs, anything we might be–would be searching for . . . ." He repeated multiple times that he entered and swept the apartment out of concern that anyone inside who realized why law enforcement was investigating Appellee could start destroying evidence.

There is neither evidence nor argument that either officer conducted any further search or accessed any of Appellee's property while waiting for the warrant. The detective affirmatively denied under oath that any such additional search was conducted or that he used anything he saw in the apartment to inform the warrant application. He stayed in the apartment because it was

more comfortable than having everyone sitting in one of the police cars while awaiting the warrant.

The warrant application itself explained why it was necessary to search for a variety of items:

> The above [extensive list of] items are being sought as Snapchat can be accessed via a mobile device, or a desktop device. Based on my training and professional experience, it is common for individuals to obtain child sexual abuse material through different means, such as direct downloads, peer-to-peer file sharing and trading with others. This rarely happens on one platform; therefore, each of the above items will be sought to determine how the child sexual image was obtained, if it has been shared with others, and if Reddick possesses additional child sexual abuse material, or has committed other offenses related to the possession and/or transmission of child sexual abuse material.

In addition to disclosing the protective sweep, the warrant application explained the evidence tying Appellee to child pornography:

> The suspect user name in this investigation was identified as having elements of Reddick's name and the associated email address was shown as qreddick@hotmail.com. Reddick has been investigated for inappropriate contact with juvenile males by TPD in 2014 and LCSO [Leon County Sheriff's Office] in 2020. Reddick had an injunction issued against him in May of 2020 for contact with a juvenile male. Reddick is a sexual offender due to a conviction for Traveling to Meet a Minor to Commit Unlawful Sexual Act in Gainesville in 2018. I confirmed the male Reddick was traveling to meet was portrayed as a male child. Reddick's last address provided during his sex offender registration (10/19/2020) was within the city limits of Tallahassee, FL at 4286 Avon Park Cir, which is the residence to be searched.

5

The description of the property to be seized in the warrant application appears to consist predominantly of broad boilerplate language involving numerous synonyms, seeking all manner of computer and cellular hardware, software, storage devices and media, input/output devices, and all data contained therein. Other items covered in the application included operations manuals, sources of passwords and usernames, correspondence and documents pertaining to images or interest in sexual exploitation of children, bills and other documents showing ownership of hardware and Internet accounts that could be used to access child pornography, items showing dominion and control of the property searched, all data on all devices that could relate to possession or distribution of child pornography, cell phones and other mobile devices capable of storing images or videos or sending or receiving electronic mail, and all potentially relevant content on such devices.

The warrant application also explained the justification for broad access to devices and materials, again in what appears to be standardized, boilerplate language. The application detailed that obtaining information from electronic devices requires processing by qualified computer experts because of the large volume of evidence that can be stored on such devices; the highly technical experience and skills required to conduct meaningful data searches; and the necessity of providing experts access to all available pertinent hardware, software, and peripherals to exhaust available data.

A judge issued the warrant as requested. The resulting search ultimately produced evidence generating new charges: one count of transmission of child pornography, seven counts of possession of child pornography, and one count of possession with intent to promote child pornography (based on Appellee's transmission of the original child-porn image).[1]

---

[1] As a result of these new law violations, Appellee's probation was revoked, and he is currently serving fifteen years in prison for the initial child-sex crime. This record did not develop the potential argument that a probationer's home can be fair game for even a warrantless search. *See United States v. Knights*, 534 U.S. 112, 122 (2001) (noting that a warrantless search of a probationer's home is

At the hearing on Appellee's motion to suppress all of the evidence, the TPD investigator—experienced in child pornography investigations—testified that child-porn perpetrators keep their materials on multiple devices, and that emulators can be used to create access to the pornographic materials across other platforms and devices (such as from cell phone to desktop or laptop, or vice-versa, meaning Snapchat images could have been accessed from both kinds of devices). He also testified at length about why it is necessary to access all possible devices and media that could contain or reflect the transmission of child pornography.

**Suppression Order**

The trial court did not watch the arresting officer's BWC video during the hearing, instead indicating he would watch it later, which the order on appeal rendered a couple of weeks later indicates he did. Appellee's counsel asserted in the motion to suppress that the second officer's BWC was produced in discovery. Counsel argued that the second video showed the arresting officer writing the warrant ten minutes after entering the house, finishing in about an hour, and then reading the warrant itself to Appellee. Appellee's counsel did not assert that either officer searched the premises or any devices before the warrant issued. However, the second officer's video was not admitted into evidence, and we do not have it.

The trial court rendered an order that expressly rejected most of Appellee's arguments. The court held that Appellee's apartment was a separate abode subject to a knock-and-talk, that the encounter was not a custodial interview, and that TPD had the right to ask the questions that were asked. The court also held that the initial Snapchat image did constitute child pornography; that the State established probable cause from Appellee's use of the

---

reasonable under the Fourth Amendment if supported by reasonable suspicion of criminal activity and authorized by a probation condition).

Snapchat app—typically a cell-phone app—through use of an emulator/VPN, which was connected to Appellee's accounts; and that there was probable cause to believe that the image could be found on multiple electronic storage devices. The court rejected Appellee's additional arguments that the actual search of seized items was stale. The trial court also found that "there is sufficient evidence of both venue and identification as to at least one crime, even after suppression."

The trial court based its suppression order on the TPD officer's "unlawful" warrantless entry into Appellee's apartment, and the officer's remaining in the apartment with Appellee while writing the warrant application and waiting for the warrant. The trial court found that the State failed to demonstrate that the warrant was not informed by the search and that law enforcement would have obtained the warrant even without the warrantless entry and sweep. The trial court reasoned that the officer "had the opportunity to survey the electronic devices available in the apartment" and "had the opportunity to specifically check during the time the affidavit was being written to add devices to be searched or clarify items to look for and then quickly grab those items after the warrant was approved."[2] The court said that the officer's gaze "paus[ed]" when looking at the two screens in the room. The trial court could not conclude that the officer would have obtained the warrant "regardless of information learned in the warrantless entry."

The court further reasoned as follows:

> Had the apartment been just a mattress and ramen noodles with no electronic devices of any kind, then it seems unlikely law enforcement would have obtained a warrant. Further, the assertion law enforcement could have obtained the warrant with the information they had is belied by the fact that they did not. In other words, the

---

[2] The court noted that the BWC from the second officer, which would have portrayed the affidavit-writing part of the process, was not submitted into evidence—though the prosecutor had mentioned it at the hearing and offered to provide it if needed.

fact that the law enforcement entered the apartment without a warrant suggests that the officer wanted to check before writing the affidavit to see what potential evidence there was or be sure he was not going to waste his time with a warrant if there was nothing to be gained. Indeed, the officer asked for permission to enter the apartment during the consensual encounter, and the Defendant refused that request. Thus, the Court finds that law enforcement wanted entry into the apartment before writing the affidavit to obtain the warrant, concludes that the affidavit is tainted by the illegal entry into the apartment, and that the independent source doctrine does not apply as an exception to the exclusionary rule.

## Jurisdiction and Standard of Review

We have jurisdiction to review orders "suppressing before trial . . . evidence obtained by search and seizure." Fla. R. App. P. 9.140(c)(1)(B). Our standard of review is de novo for the trial court's legal determinations; and we review the trial court's factual findings for competent, substantial evidence. *State v. Hineline*, 159 So. 3d 293, 296 (Fla. 1st DCA 2015) (citing *Pagan v. State*, 830 So. 2d 792, 806 (Fla. 2002)). When the supporting evidence is something more than after-the-fact testimony—such as the video recording in this record—this deferential standard does not apply fully. *Id.* Our review is much less deferential when we have the same video recording on which the trial court relied. *See Black v. State*, 59 So. 3d 340, 344 (Fla. 4th DCA 2011).

## Analysis

We are required to "follow the United States Supreme Court's interpretations of the Fourth Amendment and to provide no greater protection than those interpretations." *Perez v. State*, 620 So. 2d 1256, 1258 (Fla. 1993); Art. I, § 12, Fla. Const. ("This right shall be construed in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court.").

9

As a general rule, evidence obtained unlawfully is inadmissible. However, the independent source doctrine is an exception to that exclusionary rule. *Rodriguez v. State*, 187 So. 3d 841, 845 (Fla. 2015). The independent source doctrine "applies when evidence is discovered as a result of unlawful police activity but is also discovered independently through a lawful investigation that occurs either before or after the illegal activity, so long as the independent investigation is 'untainted by the initial illegality.'" *Jackson v. State*, 1 So. 3d 273, 278 (Fla. 1st DCA 2009) (quoting *Murray v. United States,* 487 U.S. 533, 537 (1988)). As we have noted, "the fact that police obtained evidence in a manner that violated a defendant's right against unreasonable searches and seizures does not necessarily require that a trial court exclude it." *Wingate v. State*, 289 So. 3d 566, 568 (Fla. 1st DCA 2020), *cause dismissed*, No. SC20-871, 2020 WL 3265112 (Fla. June 17, 2020).

*Murray* established that when applying the independent source doctrine to an unlawful entry, the question is "whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence." 487 U.S. at 542. The *Murray* court emphasized that the doctrine means to balance deterrence of unlawful police conduct against the public interest in utilizing all probative evidence of a crime. *Id.* at 537. Significantly for this case, *Murray* also emphasized that the goal is to avoid putting police in a *worse* position than if they had avoided a potentially improper search. *Id.*

*Murray* requires a two-pronged test for determining whether the evidence obtained had an untainted independent source: (1) whether the officer's decision to seek the warrant was prompted by what was observed during the initial entry, and (2) whether any information obtained during that entry was presented to the warrant judge and affected the decision to issue the warrant. *Id.* If the officer would have sought a warrant even without having entered the place in question, "his decision to seek the search warrant is supported by an 'independent source,' and the evidence seized under the warrant is admissible regardless of whether the initial entry violated the Fourth Amendment." *United States v. Noriega*, 676 F.3d 1252, 1260–61 (11th Cir. 2012).

10

The record before us answers both of the *Murray* questions "no." This officer clearly intended to seek a warrant before entering the apartment to sweep it, and said so as evidenced by a video recording in the record. He also did not disclose to the warrant judge any information obtained during the entry.

**Murray (1): Sweep Did Not Prompt Warrant.**

First, the evidence showed that the protective sweep did not inform the warrant. The officer told Appellee in advance of entry that he was going to get a search warrant, and testified consistently with that sequence of events at the suppression hearing. On its face, the probable cause portion of the search warrant application did not include any information that the officer did not already know before entering the apartment. Further, the application did not disclose the two blank screens or anything else the officer observed during the sweep.

The sight of two blank screens in the apartment provided no more useful information than the officer already had—that Appellee had electronic devices with internet access. The TPD officer already had Appellee's sex offender registration information, and knew that Appellee had a phone number (and thus a phone), an e-mail address, and internet, which the knock-and-talk confirmed in addition to revealing Appellee's smart watch, operational and used in plain view, which had to be paired with a cell phone. The officer testified that he had checked on Appellee's earlier charges, and thus he already knew that the very offense for which Appellee was on probation involved use of a computer and traveling to meet a minor (which the officer testified he confirmed to have been a young male) for a sexual encounter. The information the officer knew prior to and completely independent of the protective sweep was all he disclosed in the warrant application, and was sufficient to support the warrant.

This record does not support the trial court's conclusion that law enforcement could not have obtained a warrant if, as the order reasoned, "the apartment [had] been just a mattress and ramen noodles with no electronic devices of any kind." On the contrary, as a practical matter even such a hypothetically barren apartment could hold electronic devices and other evidence of child

11

pornography, making a search advisable and justifiable. But more to the present point, the record simply does not support the inference or the conclusion that the sweep informed the warrant application. The warrant application was intended, planned, and announced in advance; and it did not disclose a single piece of information gained in the sweep.

As to the scope of the warrant application, the officer testified without contradiction that it is standard practice for such warrants to be broad because of the nature of electronic devices and transmissions, coupled with the nature of child pornography and typical behavior of those who view and share it. It is standard practice in these types of investigations to include all computers, electronics, and related items that could store digital data, because many different types and sizes of devices can store media and images. In fact, the officer testified here that it would be negligent not to include other devices in a warrant application, because based on his experience child-sex offenders use multiple devices. The officer's testimony was unimpeached.

Consistent with that testimony, the warrant application appears to consist primarily of menu-driven text—one envisions a computerized menu from which to choose what to include—listing or describing every conceivable kind of equipment and other evidence potentially relevant to exactly this kind of investigation. Certainly no individual officer could compose it from scratch on the fly in less than an hour. It is obviously standard, broad language intended to cover all appropriate circumstances. Notably, the scope of the warrant was consistent with common practices followed in child-pornography investigations. *Cf. State v. Sabourin*, 39 So. 3d 376, 379–92 (Fla. 1st DCA 2010) (approving probable cause for warrant to search of home for computers, electronic storage devices, and photography equipment containing pornographic photographs of the child victim); *State v. Peltier*, 373 So. 3d 380, 383 (Fla. 2d DCA 2023) (approving probable cause for warrant to search home for electronic devices, under which over a dozen were seized). The warrant application here appears entirely consistent with that routinely used in comparable cases, not tailored to anything the officer could have seen in the apartment. There appears to be no precedent indicating that language such as that

12

used in this warrant application has ever been ruled improper. We do not conclude it was used improperly on this record.

### *Murray* (2): No Information Provided to Warrant Judge.

Turning to the second *Murray* test—whether any information obtained during the warrantless entry was transmitted to the warrant judge and affected entry of the warrant—our conclusion is the same. There is no such evidence. The trial court acknowledged as much in the order on appeal. While the officer appropriately disclosed the occurrence of the protective sweep in the warrant application, he did not disclose any information obtained during his sweep of the apartment.

Nor was there anything newly or uniquely forensically significant to disclose. The BWC video showed that Appellee owned at least two video screens of a non-portable size, but the video also showed that the officer did not look for, look at, touch, or search whatever electronic devices were *attached* to the screens (which is what really counts)—nor anything else. Both screens were black, showing nothing at all. Nothing from the BWC or the officer's testimony indicated that the officer relied on his observations from looking around the room to get the warrant. Although the trial court found it significant that these screens were viewed during the sweep, the evidence establishes without contradiction that the TPD officer assumed ahead of time that there was at least a computer in the apartment, based on Appellee's earlier charges and the application of common sense, common knowledge, and actual experience in child pornography cases about how the newly charged transmission of pornography could have occurred.

Our review of the BWC video shows that the officer simply conducted a sweep of the apartment in a manner that indicated he was making sure no one was there who could destroy potential evidence. His concern was justified because Appellee delayed answering the door; then after initially being receptive to letting the officers inside, Appellee quickly withdrew that offer, stepped outside and shut the door immediately after receiving and reading a message on his smart watch; and became increasingly defensive as the interview proceeded. The officer's concern was particularly

justifiable given that the evidence was electronic, which many cases illustrate can be destroyed very quickly and completely, thwarting law enforcement's efforts to redress these crimes. *See, e.g.*, *United States v. Babcock*, 924 F.3d 1180, 1194 (11th Cir. 2019) (recognizing that because electronic files can be destroyed so quickly, exigent-circumstances exception to the warrant requirement is "particularly compelling"); *United States v. Bradley*, 488 F. App'x 99, 103 (6th Cir. 2012) ("Courts have doubted the wisdom of leaving the owner of [an] easily-destructible [electronic device containing incriminating material] in possession of that [electronic device] once the owner is aware that law-enforcement agents are seeking a search warrant."); *State v. Darter*, 350 So. 3d 370, 384 (Fla. 4th DCA 2022) (citing these cases and upholding seizure of cell phone from child-pornography suspect who appeared to be in the process of deleting material files), *review denied*, No. SC22-1792, 2023 WL 2017393 (Fla. Feb. 15, 2023).

The trial court's ruling improperly put police in a worse position than if no entry had occurred, because they had enough information without the sweep to support issuance of the warrant—and in fact obtained the warrant without disclosing anything observed in the apartment. *See Murray*, 487 U.S. at 537. Contrary to Appellee's argument, the record establishes that the officer already knew about the user name "MarcusQ," because he mentioned it before Appellee did. The officer's testimony and the context of the BWC footage show that police also already knew both Appellee's known username and the suspect username from the cyber tip. Notably, the cyber tip username was similar to Appellee's known e-mail as well, and both usernames contained elements of Appellee's name. And in any event, the warrant application did not mention that fact. Absolutely no evidence obtained during the sweep of the apartment or in Appellee's post-*Miranda* statements was included in the warrant application. On this record, suppressing the evidence was error.

**Limits on the Exclusionary Rule.**

Finally, we address whether suppression was required simply because the officer entered the apartment without a warrant. The trial court said this in the order: "[T]he fact that the law

14

enforcement [sic] entered the apartment without a warrant suggests that the officer wanted to check before writing the affidavit to see what potential evidence there was or be sure he was not going to waste his time with a warrant if there was nothing to be gained." As we have already demonstrated, this is speculation or theory, and is contrary to the only evidence before the trial court, including the officer's testimony. *See State v. Williams*, 119 So. 3d 544, 545 (Fla. 1st DCA 2013) ("Testimony that is not impeached, discredited, or controverted, nor is self-contradicting or physically impossible, must be accepted by the trial court."). Even more significantly as a matter of law, the Supreme Court in *Murray* expressly *rejected* the reasoning that suppression is required if law enforcement allegedly tried to "check" for potential evidence before seeking a warrant. *See Murray*, 487 U.S. at 542 ("while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied").

As we have noted recently, to show probable cause there must be a showing that "*particular* evidence of a *particular* crime will *probably* be found in a *particular* place . . . And that determination simply asks whether a reasonably prudent person would think the allegation *probable*." *Malden v. State*, 359 So. 3d 442, 445 (Fla. 1st DCA 2023). The facts before us taken together establish probable cause to believe Appellee was in possession of child pornography. Even if the warrant had contained information obtained during the protective sweep—which it did not—the officer had probable cause sufficient to obtain a warrant to search Appellee's apartment for child pornography absent anything he observed during the protective sweep.

The TPD officer arrived with the intention to obtain a search warrant, and told Appellee before the sweep that he was going to secure the property in anticipation of getting a search warrant. This evidence was undisputed and unimpeached; in fact, it was bolstered at the hearing with evidence of the officer's considerable experience and understanding of similar cases. To the extent that the trial court's reasoning was rooted in the belief that there was insufficient evidence to obtain a search warrant, the record is to the contrary. TPD had enough evidence to obtain a warrant without entering the apartment, and in fact obtained a warrant

without disclosing to the warrant judge anything about the pre-entry encounter with Appellee or what was observed upon entry. Because the warrant was issued wholly on the basis of information known before entry, the evidence was admissible under the independent source doctrine. *See Segura v. United States*, 468 U.S. 796, 799 (1984) ("[T]he evidence discovered during the subsequent search of the apartment the following day pursuant to the valid search warrant issued wholly on information known to the officers before the entry into the apartment need not have been suppressed.").

REVERSED.

RAY, J., concurs; ROBERTS, J., dissents with opinion.

—————————————————

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

—————————————————

ROBERTS, J., dissenting.

A person's home—whether it is a mansion behind iron gates, a three-bedroom ranch house, an apartment, or a travel trailer—is the area most protected by the Fourth Amendment. With very few exceptions, a search warrant signed by a neutral and detached magistrate is always required **before** entering a person's home. We should affirm Judge Hawkes' order of suppression here.

### The Search

Tallahassee Police Department (TPD) received a cyber tip from the National Center for Missing and Exploited Children (NCMEC) that a suspected child pornography image had been transmitted to/from a Snapchat account. The tip identified a date of birth, an email address, a phone number, a Snapchat username, and an IP address. A preliminary investigation led TPD to believe the account belonged to Appellant, a registered sex offender. A

16

TPD Detective went to Appellant's address for a knock-and-talk to verify his residence and his online identity.

Appellant answered the door, and Detective Osborn told him that they needed to speak with him about his sex offender information. Appellant stepped outside the apartment; he did not let the officers go inside. Detective Osborn asked Appellant to verify his information including his date of birth, phone number, email, and internet identifiers. After verifying the information, Detective Osborn felt confident the Snapchat account from the cyber tip belonged to Appellant and believed he had probable cause to arrest Appellant and get a search warrant.

Detective Osborn did not immediately seek a search warrant. After seizing and handcuffing Appellant outside his home, Detective Osborn performed "a sweep" of the apartment "to ensure that no one else was inside the residence who could destroy any evidence of this investigation[.]" In his body-worn camera footage, Detective Osborn can be see scanning the interior of the home, pausing to take note of computers and other electronic devices. After the sweep, Appellant was brought inside. Detective Osborn, Appellant, and another officer sat at a card table in the kitchen while Detective Osborn typed out his warrant application and submitted it electronically to the duty judge. When asked why they remained in Appellant's home for the typing and waiting for the search warrant to be approved, Detective Osborn said it was to remain in a comfortable location. After an hour and a half, Detective Osborn received the approved search warrant from the judge, executed the "search," and seized the evidence that was eventually suppressed by trial court.

**The Trial Court's Suppression Order**

On August 7, 2023, the trial court heard two motions to suppress evidence, two motions to dismiss, and a motion *in limine*, all filed by Appellant. The trial court denied all motions, except the motion to suppress at issue in this appeal. That motion sought to suppress the evidence seized in the home after the "card table warrant" on the argument TPD had entered Appellant's home illegally and searched prior to receiving a valid search warrant. In the order granting the motion, the trial court stated, "The State conceded that remaining in the apartment to write the warrant

17

and wait for its approval, a process that took approximately an hour-and-half, was improper, but that the suppression should not be ordered because of the independent source doctrine." The order also noted the State conceded "that the entry/lingering was not under exigent circumstances" and it would not "seek to uphold the search under the inevitable discovery doctrine." The court granted the motion to suppress, concluding the "affidavit is tainted by the illegal entry into the apartment, and that the independent source doctrine does not apply as an exception to the exclusionary rule."

## Analysis

The majority notes that the officer was "secur[ing] the apartment in anticipation of obtaining a search warrant." The opinion gives a narrative of what is seen on the body-worn camera while the officer enters the apartment and conducts his search. The opinion notes that while the officer did search the bathroom and utility closet, he did not "open any cabinets, drawers, or anything else that could function as a container." All of this sounds nice, but it totally brushes by the fact that at that time, the officer had no legal authority to enter the dwelling. Appellant's arrest occurred **outside** the home. There is no general authority to enter a home of someone arrested outside to determine if there are other people in the home.

## Standard of Review

The majority correctly notes that our standard of review is *de novo* for the trial court's legal determinations, and we review the trial court's factual findings for competent, substantial evidence. *State v. Hineline*, 159 So. 3d 293, 296 (Fla. 1st DCA 2015). The majority cites *Hineline* for the proposition that we do not owe deference to the trial court's findings of fact where the trial court is in no better position to evaluate the evidence than we are. *See id.* (recognizing deference to a trial court's findings of fact does not fully apply when the findings are based on evidence that is presented in essentially the same form to the appellate court). Were the body-worn camera footage the only evidence that the trial court considered in making its factual determinations, that would be entirely correct. But the trial court also received live testimony from Detective Osborne. Our review of the transcript of that testimony is not the same. Sometimes, how something is said by a

18

witness is as important as the words that are spoken. With live testimony, we owe deference to the trial court's factual findings.

## The Independent Source Doctrine

There is no question that the officers were without legal authority to enter Appellant's apartment prior to applying for and receiving the search warrant. The State conceded this point, and the trial court so found. However, the "independent source" doctrine permits the introduction of evidence initially discovered during, or as a consequence of, an unlawful search but later obtained independently from lawful activities untainted by the initial illegality. *See Rodriguez v. State*, 187 So. 3d 841, 845 (Fla. 2015); *Jackson v. State*, 1 So. 3d 273, 278 (Fla. 1st DCA 2009). To determine whether an independent source is untainted, the trial court, citing *Murray v. United States*, 487 U.S. 533 (1988), properly recognized its analysis required the following inquiries: "(1) was the warrantless entry disclosed in the application for the warrant; (2) did observations from the warrantless entry inform the application for the warrant; and (3) would the government have applied for a warrant apart from the warrantless entry."

The court found the first factor weighed for the State. But the court found the two remaining factors weighed against the State. On the second factor, the court found that when TPD illegally entered, the officers "had the opportunity to survey the electronic devices available in the apartment, and in fact, did so as is apparent on the body [worn] camera submitted in evidence, with the officer's gaze pausing over electronic devices twice in areas where no person could be hiding." This impropriety was compounded "exponentially" because Detective Osborn wrote the affidavit while sitting in the apartment and then executed the search. On the third factor, the court found the "fact that law enforcement entered the apartment without a warrant suggests that the officer wanted to check before writing the affidavit to see what potential evidence there was[.]" The trial court made these findings based on viewing the body-worn camera footage, reviewing the warrant application, and evaluating the in-court testimony of Detective Osborn.

In *Murray*, the Supreme Court rejected the contention of the Court of Appeals that "there was no causal link whatever between

19

the illegal entry and the discovery of the challenged evidence." *Id.* at 543. The Court stated, "[I]t is the function of the District Court rather than the Court of Appeals to determine the facts" and specifically remanded to the Court of Appeals with instructions that it remand to the District Court for determination whether the warrant was independent. Here, the trial court made the appropriate findings to conclude the independent source doctrine did not apply as an exception to the exclusionary rule. We must defer to those findings.

For these reasons, I would affirm.

_____

James Uthmeier, Attorney General, and Benjamin L. Hoffman, Assistant Attorney General, Tallahassee, for Appellant.

Melissa Joy Ford, Assistant Conflict Counsel, Office of Criminal Conflict and Civil Regional Counsel, Region One, Tallahassee, for Appellee.